146 So. 398

**ESPALLA et al. v. LYON CO.**

**I Div. 728.**

Supreme Court of Alabama.

Jan. 19, 1933.

Rehearing Denied March 9, 1933.

Stevens, McCorvey, McLeod, Goode & Turner, of Mobile, for appellants.

Harry T. Smith & Caffey, of Mobile, for appellee.

GARDNER, Justice.

The cause was tried on plaintiffs' part upon count 9 as amended (appearing in the report of the case), which was fashioned after the complaint in Charles R. Byrd & Co. v. Age-Herald Pub. Co., 219 Ala. 505, 122 So. 831, and which seeks damages within the contemplation of the parties in the amount of plaintiffs' commission as a broker arising from the breach of the special contract therein set out.

At the conclusion of the evidence, there was a directed verdict for the defendant, and the action of the court in giving such charge presents the question of first importance on this appeal.

The partnership of Joseph Espalla, Jr., & Co. was composed of Joseph Espalla, Jr., and J. E. Crabtree, Jr., and was engaged in a general real estate business, including selling and renting property for owners.

Joseph Espalla, Jr., conducted all negotiations as to the contract, the subject-matter of this litigation, but we think it clearly inferable from the proof that such transactions were within the course of the firm's business (47 Corpus Juris, 996), and in fact a partnership affair. The suggestion to the contrary is without merit.

We also entertain the view that the authority of R. W. Hamill, president of defendant corporation, to make a binding agreement, was a jury question. The resolution of the directors of May 2, 1911, is to be read in connection with the broad language of the corporation's by-laws, and all of which is to be considered in relation to the evidence tending to show said Hamill was not only the president and general manager of the corporation, but in fact its alter ego, particularly so far as concerned transactions of this character which were embraced as a part of the primary purpose of its organization. Navco Hardwood Co. v. Bass, 214 Ala. 553, 108 So. 452; Jerome H. Sheip, Inc., v. Baer, 210 Ala. 231, 97 So. 698; Georgia Cotton Oil Co. v. Carlisle Seed Co., 200 Ala. 226, 75 So. 984; Ala. City, G. & A. Rwy. Co. v. Kyle, 202 Ala. 552, 81 So. 54.

■ It is suggested the affirmative charge is to be justified upon the theory of a variance between the pleading and proof as to the title proving satisfactory to the attorneys for the purchasers. But we think the proof discloses no such material variance. In the absence of stipulation to the contrary, the contract would imply the purchasers were to receive a good and marketable title. Messer-Johnson Realty Co. v. Security Savings & Loan Co., 208 Ala. 541, 94 So. 734; Baker v. Howison, 213 Ala. 41, 104 So. 239, 52 A. L. R. 1452.

■ The parties, however, could validly stipulate that the title prove satisfactory to the purchaser's attorney, imposing in this respect more strict requirements, but nevertheless leaving no room for capricious rejection, but requiring any dissatisfaction be founded and entertained in good faith. McDennis v. Finch, 197 Ala. 76, 72 So. 352.

True, Espalla testified the cash payment following the earnest money deposit was to be paid when defendant furnished abstract of title, allowing ten days for its examination, and the title found to be good, omitting reference to the opinion of attorneys thereon. Considering the magnitude of the sum involved, it may be the jury, in the light of the testimony of two of the proposed purchasers (Prine and Boykin), would · have been justified in interpreting the language of Espalla to mean the title as thus examined should be found good by the attorneys. But this aside, all doubt as to the true meaning is relieved by the testimony of R. W. Hamill and Matlock, witnesses for defendant, to the effect that Espalla's proposal as to such payment was conditioned upon the approval of the attorneys that the title was good. Transcript, pp. 109, 123, 127.

■ Nor is there merit in the suggestion that by reason of the requirement of approval of title by attorneys the proposed contract was for a purchase of an option only, which would permit of no compensation to the broker whose undertaking, as here, was to procure a purchaser. 9 Corpus Juris, 604. The discussion of the question in McDennis v. Finch, supra, should suffice to demonstrate that such a contract stipulation was valid, and such requirement does not render it a mere option.

The optional feature of the contracts considered in Weitbrec v. Morris, 62 Colo. 345, 163 P. 1119; Watson v. Odell, 58 Utah, 276, 198 P. 772, 20 A. L. R. 280; Hanscom v. Blanchard, 117 Me. 501, 105 A. 291, 3 A. L. R. 545; and Woolley v. Batchelder, 35 Cal. App. 177, 169 P. 408, cited by appellee, did not relate to the question of attorneys' approval of title. In the Weitbrec Case, supra, there are expressions in the opinion of the majority (the case being more exhaustively treated in a vigorous dissent) that appear to lend support to appellee's insistence, but a careful reading, in the light of the facts, discloses the discussion of the case in that respect not necessary to a decision, and mere dictum. But, if construed otherwise, we would be unwilling to follow.

The complaint alleges that plaintiffs were employed to obtain a purchaser for the property at a price of $525,000, of which $500,000 was to be net to defendant—plaintiffs' compensation to be a commission of 5 per cent.

on said $500,000 to be paid out of the total purchase price.

No sale was consummated, and defendant insists that under these circumstances in a contract of this character no recovery could be had unless the broker either produces to the owner a customer who is able, ready, and willing to buy on the terms prescribed by the owner, or takes from the customer a binding contract of purchase. This is the generally accepted rule. 9 Corpus Juris 608; Hayden v. Grillo, 35 Mo. App. 647; Gunn v. Bank of California, 99 Cal. 349, 33 P. 1105; Gerding v. Haskin, 141 N. Y. 514, 36 N. E. 601.

In the statement of the rule it is understood, of course, that these requirements may be the subject of waiver on the owner's part (9 Corpus Juris, 608; Hayden v. Grillo, supra), for, as stated in the Hayden Case, supra: "The law would not require the broker to go to the trouble of obtaining a written contract or of producing the purchaser when the owner refuses to sell for other reasons," and such is the effect of our own decisions. Overton v. Harrison, 207 Ala. 590, 93 So. 564; Morgan v. Whatley & Whatley, 205 Ala. 170, 87 So. 846; Bailey v. Padgett, 195 Ala. 203, 70 So. 637; Hannon v. Espalla, 148 Ala. 313, 42 So. 443.

And, in passing, we may further note that under our authorities plaintiffs' verbal employment does not run counter to the statute of frauds (Stevens v. Bailey & Howard, 149 Ala. 256, 42 So. 740; Bailey v. Padgett, supra), and the further fact that the purchaser has not become bound in writing is also no defense so long as the purchaser takes no advantage thereof. Sayre v. Wilson, 86 Ala. 151, 5 So. 157; Bailey v. Padgett, supra; Stevens v. Bailey & Howard, supra; Morgan v. Whatley & Whatley, supra.

We are persuaded from a careful study of the record that the evidence makes out a case for the jury's consideration. A brief review of the tendencies of the proof will suffice. The larger portion of the real estate, consisting of 6,800 acres, was what is called Hollinger's Island, though it appears that in reality it was a part of the mainland. There was adjoining a tract of 2,200 acres which also belonged to defendant, and the contract here involved the sale of the whole consisting of approximately 9,000 acres. In November, 1924, Espalla and Hamill, the president of the defendant company, in the city of Mobile, had negotiations for a sale of the island at $30 per acre, or a total of $204,000, and Espalla began his efforts to find a purchaser. Details of negotiations may well be omitted.

In January, 1925, Hamill advised Espalla the price was raised to $250,000, with a maximum commission of 5 per cent. And in February, 1925, Espalla and Hamill had another meeting in Mobile at which time Hamill stated the city wanted to buy the island, and, if Espalla did not busy himself, he would lose a sale, referring to the fact that he had been talking to Norville Bros., another real estate firm, concerning a sale to the city. In this conversation he advised Espalla the price had been increased to $350,000. Espalla agreed to exert his efforts. There was another meeting in April, 1925, when Hamill advised that the price for the island alone was $350,000, with a reservation of the timber and turpentine rights. The 2,200 adjacent acres had not then been included.

One Matlock was field agent for defendant company, and had been for several years employed in such capacity. It may very reasonably be inferred from the proof that he was at all times in close touch with Hamill. In the early part of June, 1925, Matlock came to Espalla's office with a list containing a description of the 9,000 acres embracing the island and the adjacent land, and left this list at the office, advising Espalla that Hamill had raised the price, and was going to sell the 9,000 acres for $500,000 net to the company, and "to get busy and get a buyer." Espalla then, to use his language, "started out after Mr. Boykin, Mr. Prine, Mr. Radcliff and Mr. Everett." They went down with him to look over the property accompanied by Matlock. They agreed to purchase for $525,000, if stated terms were acceptable. Matlock went to Biloxi, near where Hamill was then staying, and, in a few days, on June 11th came to the office of Espalla about 5 o'clock in the afternoon, stating that the offer of these people was satisfactory, but would have to be confirmed by Hamill, and gave Hamill's telephone number that Espalla might call him for that purpose. This telephone conversation in the late afternoon of June 11th, and what occurred the following morning in Espalla's office, may be better understood by setting out that portion of Espalla's testimony on direct examination touching this feature of the case, as follows:

"This was over the 'phone, on the evening of June 11th, 1925, about six o'clock. I told Mr. Hamill that I had some parties who would probably buy the 9,091 acres of land. I was to sell 9,091 acres of land for $525,000. On this occasion I told Mr. Hamill that I thought I could get some buyers on these terms: $125,000.00 cash, $100,000.00 in one year, $100,000.00 in two years, $100,000.00 in three years and $100,000.00 in four years, at five per cent. interest on the deferred payments, and he said he wanted six per cent. I told him the names of the parties that I thought I could sell it to. I told him Prine, Boykin, Everett, Crawford and Radcliff, these being the five names that I gave him. I told him they were my purchasers—the ones I thought would purchase it. We agreed we could get $10,000 earnest money, and if he

would furnish an abstract of title down to date and give these gentlemen ten days to examine the title, and if it was good they would pay the other $115,000.00.

"In this conversation he said he wanted $500,000.00 net, and I was to get my commission on the outside, which was to be $25,-000.00. There was $125,000.00 of this money that was to be paid in cash. $100,000.-00 of it was to go to the Lyon Company, and $25,000.00 was to come to me. Mr. Hamill agreed to this. Mr. Hamill said he wanted $100,000.00 for a first payment, and then I wanted $25,000.00 for my commission, which made $125,000.00. I told him I wanted five per cent. on $500,000.00. He agreed that I should have it. I had it understood over the 'phone with him as to when the $25,000.-00 was to be paid. It was to be paid as soon as the title had been examined and the $125,-000.00 had been paid in full on the first payment. I was to get a commission of five per cent. Mr. Hamill told me that Judge Mc-Aleer, the attorney for the company, had abstracts of title covering the property. Mr. Hamill agreed to furnish an abstract down to date. Mr. Hamill said he wanted $10,-000.00 earnest money. I told him I would get it. In this conversation it was said that if the title was good it was to be used as a part of the purchase money, the first payment of $125,000.00. Mr. Hamill asked me for $10,000.00 earnest money. I said if the title was good the $10,000.00 put up as earnest money would be added to the other $115,-000.00 to make the first payment of $125,-000.00. He said that was all right. I said to him that if the title was not good Mr. Prine, Radcliff and the other purchasers would get their money back. Mr. Hamill said he would sell the property on these terms, if I could get a purchaser. He authorized me to sell it on these terms, and I went out and got him a purchaser, Mr. Hamill told me that if I could get a purchaser for the property for $500,000.00 net, that is including the 9,091 acres of ground, that they would sell it at $100,000.00 cash net to them, and $100,000.00 a year at five per cent. interest, and I was to get $25,000.00 more, which would be $525,000.00 for my commission, which was five per cent. on $500,000.00. There was about 2,226 acres adjacent to Hollinger's Island that we were discussing with Mr. Hamill on that occasion, and about 6,-800 acres in Hollinger's Island. In this 'phone conversation I told him I could get $10,000.00 as earnest money and turn it over to Mr. Matlock and he told me no, he did not want me to do that, but to have the $10,-000.00 and he would be there next morning at 11 o'clock to close up the trade. In that conversation it was said that my prospective purchasers were to be allowed ten days within which to examine the abstract of title. The defendant company was to have a ven-

dor's lien or a mortgage on the property which they were conveying to my purchasers for the balance of $400,000.00 of the purchase price. I was never employed by Boykin, Prine, Radcliff, Crawford or Everett to represent them. In my efforts to sell Hollinger's Island and the 2,200 odd acres adjacent thereto, I never at any time represented anybody, except the Lyon Company. In this conversation with Mr. Hamill he stated that he would be at my office the next morning at 11 o'clock to close up the trade. I left my office after having the conversation with him over the 'phone, and went into the Battle House, and there I met Mr. Frank Boykin, Mr. Prine, and Mr. Radcliff, and I think now, I am not sure about that, Mr. George Crawford, I told them they could buy this property for $525,000.00 on the terms that Mr. Hamill had given me, and they accepted and I said, 'Well, then you be there in my office with $10,000.00 earnest money at 11 o'clock next morning, for Mr. Hamill will come up to make the trade.' I don't remember whether Mr. Everett was there that night or not, but I met Mr. Everett about ten o'clock the next day in the Peoples Bank. He was making a deposit there and I said to him, 'Well, are you going to be over at my office at 11 o'clock,' and told him that they were coming up to close the trade and he said J. C. Prine would be there to represent him with the money—that he would also be there to represent Mr. Boykin with the money, at 11 o'clock. At 11 o'clock Mr. J. C. Prine and Mr. Herndon Radcliff, two of the men whose names I mentioned as my purchasers, showed up at the office. Also Mr. Hamill, Mr. Matlock and Mr. Hamill's son.

"This was on June 12th, 1925, Mr. Hamill, Mr. Matlock and Mr. Hamill's son arrived at my office first and we talked the matter over a little bit about the abstract and one thing and another and then Mr. Prine and Mr. Radcliff came in and I introduced them to Mr. Hamill. They talked over the matter and Mr. Hamill said: 'Well, now you gentlemen may want to sell some of that property, or resell some of it, and you want some reservation put in there.' I do not remember whether it was Radcliff or whether it was Prine said to him: 'Mr. Hamill, we are not asking for any reservation; we want to buy the property outright; we were to pay you the ten thousand dollars earnest money and get the abstract.' Mr. Hamill said: 'Well, don't you want to get a release in case you sell any of the property?' And just then Mr. Prine says: 'Well, ain't you going to close up this trade with us; we want to pay you the ten thousand dollars earnest money and get your receipt for the earnest money and get the abstract.' Mr. Hamill said he would see and then Prine and Radcliff left. In this conversation I named over the

five people who were buying the property, being Frank Boykin, Everett, Radcliff, Crawford and Prine. Mr. Hamill made objection about Frank Boykin. He said Frank Boykin was convicted, or something of that sort, about some liquor business and he did not know whether he could pay or not. He also spoke of George Crawford and said he was afraid he would get hooked up on a second commission on account of Crawford being a city commissioner; that he had authorized Norville Brothers to sell that property to the city commission. I told him Crawford was Mayor of the City of Mobile and that he had nothing to do with buying the property except that he was only taking a small interest in it and that his friends had told me that they simply let him have a small interest. He said he was afraid he would have to pay this double commission to Norville Brothers. Hamill made no objection whatever to my failure to have present there Mr. John Everett, Mr. George Crawford and Mr. Frank W. Boykin, the other three purchasers. He did not ask me to bring these other three people there. This conversation or this meeting broke up by Mr. Hamill saying he would be back at four o'clock and fix up the matter. He wanted to go out, I believe, to talk to his lawyer about the commission, whether he would have to pay another commission to the city of Mobile and something about Frank Boykin that he wanted to see his lawyer about and he would be back there at four o'clock. Prine, and Radcliff were notified to come back at that time and there (they) were there promptly at four o'clock. Mr. Hamill did not show up. I did not see Mr. Hamill again that afternoon."

Without discussion in detail on that point, we conclude there is ample evidence from which the jury could reasonably infer that Hamill instructed Matlock to see Espalla at the time, early in June, he came to Mobile with a list description of the entire tract and to state to him the proposition as to the sale of the island and adjacent lands. True, as argued by defendant's counsel, Matlock was not an agent with authority to sell or bind the corporation in regard to a transaction of that character, but he could well serve as a messenger and a medium of communication between Hamill and Espalla, between whom there had been several negotiations as to a sale of the larger portion of the property. There is proof justifying the inference that Hamill was, on this occasion, speaking to Espalla through Matlock, and the evidence as to the telephone conversation on June 11th tends in confirmation of this theory. Espalla testifies he was employed by no one, except Hamill, and some of the proposed purchasers substantiate his testimony. The argument, therefore, that the undisputed proof discloses no employment for this sale by defendant, and that Espalla produced purchasers on their behalf and without defendant's authority, is without merit. All of this was for the jury.

■ But, it is argued, the purchasers were not produced for that on the morning of June 12th only two of the proposed purchasers were present, and that the presence of all was essential to a right of compensation.

Some of the cases relied upon have been previously noted, Gerding v. Haskin, supra; Gunn v. Bank of California, supra; Hayden v. Grillo, supra.

The proof shows, however, that Hamill was informed there were five purchasers, and the name of each, and it appears also that the two present, Prine and Radcliff, represented those absent. While there was no written authority for such representation, yet it should be considered that the meeting was preliminary only, involving the payment of the "earnest money" of $10,000, procuring a receipt therefor and abstract of title for examination. We do not find in the cited cases any such situation as here presented.

But, this aside, the proof tends to show, as alleged in the complaint, that no objection was made that the others were absent and no question raised as to the authority of those present to act for all.

According to plaintiffs' contention, Hamill presented two inquiries only, as set out in the complaint and in the extracts from his testimony, and these the jury could reasonably infer were without substantial merit. It is inferable also that, had any such objection been raised, it could have been readily obviated by the procurement and presentation of the others.

In Overton v. Harrison, 207 Ala. 590, 93 So. 564, 565, we approved the following from the New York Court of Appeals, here applicable: "No such objection was taken at the time by the defendants, and, had it been, the difficulty, no doubt, would have been obviated at once by the plaintiff disclosing the name of the purchaser. Even if ordinarily a broker is required to furnish the name of the purchaser as a condition precedent to his right to claim commissions on the sale, as the defendants interposed no objection on that ground and absolutely disavowed the sale, they waived the right to insist upon any such condition." See, also, Hayden v. Grillo, supra, which concerns directly the production of the proposed purchasers.

It cannot be successfully contended that the evidence was insufficient for the inference that Hamill did in fact disavow the sale on this occasion. True, he did not in so many words, but the jury could infer that his language and conduct was tantamount to a disavowal and a refusal to consummate the sale,

especially in view of his failure to return in the afternoon as understood between all parties, which engagement Prine and Radcliff promptly kept.

The evidence hereinabove quoted suffices to sustain this view without further discussion here. And, indeed, the letter of Hamill of June 17th, in which, speaking of what occurred on the morning of June 12th, he uses the language, "I said that we had withdrawn the property from the market," itself discloses his attitude on that occasion as to any disavowal of the trade. The absence of the other proposed purchasers, under these circumstances, cannot avail as a matter of law to deprive plaintiffs of their right of action.

■■■■■ It is further strenuously insisted that the proposed purchasers were not ready, able, and willing to make the cash payment required, and did not have in hand the $10,000 "earnest money." Counsel for defendant cite many authorities, but, as said in Mechem on Agency (2d Ed.) p. 2021, "what constitutes financial readiness or ability in these cases cannot be determined by any hard and fast rule," and much must depend upon the peculiar facts of each particular case.

Among the authorities cited by defendant are Reynor v. Mackrill, 181 Iowa, 210, 164 N. W. 335, 1 A. L. R. 523; Smith v. Penn, 151 Ill. App. 155; Bateman v. Richard, 105 Okl. 272, 232 P. 443; Watters v. Dancey, 23 S. D. 481, 122 N. W. 430, 139 Am. St. Rep. 1071; Dent v. Powell, 93 Iowa, 711, 61 N. W. 1043; Harris v. Leise, 29 S. D. 140, 135 N. W. 687; S. V. Thompson Co. v. Goldman, 51 Pa. Super. Ct. 632; Chitwood v. White, 18 Ala. App. 331, 92 So. 84. They are each to be differentiated on the facts from the instant case.

The nearest approach to the defendant's contention that the proposed purchasers here must have had the cash in hand to pay the "earnest money" is doubtless that of Watters v. Dancey, supra, from the South Dakota court, wherein such expression is used, though as we construe the opinion the gist of it is that the purchasers having property out of which the purchase money may be made is not sufficient. 9 Corpus Juris, 599.

In Chitwood v. White, supra, the purchaser not only did not have the cash in hand, or under his control, but to obtain the funds at all he must apply for and procure an order of court necessitating judicial proceedings. We do not understand that the strict rule as to a tender is applicable to cases of this character.

The broker, of course, cannot prove his case by showing he produced a straw bidder, but, on the other hand, we approve the holding of those authorities that he need not produce one with cash all in hand in legal tender, and that he have the necessary funds then at his command should suffice. McCabe

v. Jones, 141 Wis. 540, 124 N. W. 486; Catlin v. Jones, 52 Or. 337, 97 P. 546; McDermott v. Mahoney, 139 Iowa, 292, 115 N. W. 32, 116 N. W. 788; Hutchinson v. Plant, 218 Mass. 148, 105 N. E. 1017.

We are impressed with the statement of the rule which we think applicable to the present situation as found in 2 Williston on Contracts, § 833:

"It is said that the strict rules of tender are not applicable to a conditional offer to perform a concurrent condition; that what is essential is that it shall appear to the court and shall have been made clear to the other party to the contract that the exchange agreed upon would be carried out immediately if the latter would do his part. This requirement involves both ability on the part of the plaintiff to perform and an indication of that ability to the other party. The actual production of the money or other thing which the plaintiff is to give is said to be unnecessary. This must be rested, however, on the ground of waiver, for generally the defendant, if he is not going to perform, will indicate that fact in some way, and thereby excuse a more particular tender. Even if it be supposed that a conditional offer of performance is made with ability to produce, but without actual production of the money or goods necessary for performance and the defendant declines the offer, without giving a reason for his refusal or in terms refusing to perform himself, the same principle seems applicable. Unless actual production is then demanded no doubt such an offer suffices, but, it does not seem too imaginative to say that the failure of the defendant to state the ground of his objection was such deceptive conduct as to induce the plaintiff to believe that the objection was based on some other ground than the technical defect of the tender." See, also, 2 Mechem on Agency (2d Ed.) § 2441.

The rule as thus stated is in harmony with our own decisions. That the doctrine of strict tender in such cases is not to be applied was expressly stated in Baker v. Lehman, Weil & Co., 186 Ala. 493, 65 So. 321, where it was also held that slight evidence is sufficient to show such readiness and ability. That authority contains the following excerpt from the opinion in the early case of McGeehee v. Hill, 1 Ala. 140: "The law, in requiring proof of ability in such cases as this, is to prevent either party from taking advantage of a breach of contract, which he himself was not able to comply with; and yet, if the law were thus to be settled [i. e., as requiring the vendee to have the actual money], a man of undoubted ability to comply with his contract in point of fact, would in theory, be held incompetent. * * * The counsel for the plaintiff in error, maintains that the only test of this ability would be having the money then in his possession.

But would not his ability be just as certain if he had the money in Bank, subject to his check, or in the hands of a friend subject to his order or demand, or to go further, if the property in his possession, and his credit in the community were such that he could have promptly raised the money to meet his engagement, would it not be a certainty in a moral point of view, as positive as the other." McGeehee v. Hill, 1 Ala. 140, 146, 147.

The Baker Case, supra, is also authority to the point that the presence of Prine and Radcliff in the office of Espalla on the morning of June 12th, demanding of Hamill the abstract of title, and offering then to pay the $10,000 earnest money, was prima facie, at least, some evidence of their readiness and ability to pay the required cash sum, which holding was given approval in the very recent case of Ex parte O. B. Finklea (re Finklea v. Garrick) ante, p. 160, 147 So. 680.

In the instant case, it is not pretended Prine and Radcliff had the cash in hand. The testimony shows they intended to pay the $10,000 by checks. Prine testifies he had checks ready for $7,500, and Radcliff had his for the remainder. Many years had passed, and Prine was uncertain what check he had, but thought it was that of Prine, Everett, and Boykin, and much stress is laid by defendant upon subsequent proof that this particular firm had not on that date opened an account with that bank. But these three, Prine, Everett, and Boykin, were men of financial means, worth in the aggregate about $700,000, according to the proof, and interested together in various enterprises. Prine's worth was $250,000, and he had to his individual credit in two of the banks of Mobile in the savings account $21,000. His testimony and that of Boykin disclose they were ready and able to carry through this trade on their own account, and without aid from Radcliff and Crawford, whose financial responsibility is not shown. Their testimony is to the effect they got money from the bank when needed. Boykin testifies that he, Prine, and Everett "were ready to go ahead and complete that purchase in the event the other fellows fell down on it. * * * If the other gentlemen had fallen down on the deal we would have had to go on and purchase the land if we had signed up. * * * I mean that Prine, Everett and Boykin, my two partners, and myself, were going ahead with the deal if anybody else had fallen down." Prine says: "I and my associates were able to carry out this trade. I and my associates were ready to carry out this trade. * * * I was willing and able to go ahead with the trade. At the time of this transaction my approximate net worth was at least $250,000.00."

The evidence further shows these men were rather anxious for the trade, and Prine and Radcliff went to the office that morning for the purpose of paying the "earnest money," and procuring the abstract. Whether they had proper checks or the cash then in hand, the jury could readily infer from the evidence that the actual cash would have promptly been produced had Hamill given indication he would receive it and deliver the abstract. This proof further tends to establish the ability of the purchasers to meet the first cash payment of $115,000, in addition to the $10,000 earnest money, the remainder to be secured by a vendor's lien on the property.

■ Thus we are brought again to the principle of waiver referred to in Overton v. Harrison, supra, and applied in other of our decisions. Hamill made no objection that the proposed purchasers had no cash in hand, or that the checks which they had might not be good, or that the proposed purchasers were financially unable to carry out the trade, but only an expression of some fear of being subjected to a double commission, and of the effect of the conviction of Boykin of a conspiracy to violate the National Prohibition Law might have upon him in his future payments. We therefore conclude that the jury could infer the proposed purchasers were able, willing, and ready to carry through the trade and pay the "earnest money," and that Hamill by his conduct has waived any requirement that they have in hand the actual cash.

Nor do we understand the failure of the proof to show the financial ability of Radcliff and Crawford materially affects the case. The law looks to practical ends. There was no relationship of trust and confidence and reliance upon the skill of the broker. Handley v. Shaffer, 177 Ala. 636, 59 So. 286. Plaintiffs' employment was merely to produce a purchaser ready, able, and willing to purchase at the price and on the terms of the owner. Defendant presumably wanted the purchase money paid as agreed, and, if this is done, it could not concern itself that the money came from three rather than from all five of the purchasers.

The question of whether the purchasers were to get a warranty deed was not considered, and is not shown to have been made a condition precedent. One of them testified merely that they expected such a deed, but no agreement made to that effect, and, if the attorneys should advise otherwise, and recommend the title as good, they would have accepted other character of deed.

■ The argument there were others interested, whose names were not disclosed, is contrary to the express testimony offered to the effect that these five only were interested in the purchase. The evidence was further to the effect that the deed was to be made to these five, and it is to be inferred

that the liability for the remainder of the purchase money would be joint and several. Section 5719, Code 1923. What division the purchasers made among themselves as to their respective proportionate interest would not seem to affect defendant in any manner.

We conclude, therefore, that plaintiffs' proof tended to support all material allegations of the complaint, and that the same proof tended also to disprove the numerous special pleas interposed and sustained by the court's rulings.

The action of the court in giving the affirmative charge for defendant was error to reverse.

Objections were sustained to a number of questions to plaintiffs' witnesses, which were intended to elicit proof as to the financial ability of Prine, Everett, and Boykin, and their ability to readily pay the required cash, when demanded. This was an important feature of plaintiffs' case, and we are of the opinion that some of these rulings too narrowly restricted plaintiffs in their proof. Clark v. Wilson, 41 Tex. Civ. App. 450, 91 S. W. 627.

The witness Boykin should have been permitted to answer the question as to those interested in the purchase, aside from himself, and such question was not subject to the objection that it called for a conclusion of the witness.

The proof indicates a very rapid rise in real estate values, or, rather more accurately, real estate "prices" about the time of the transaction, a change in price weekly, if not daily. The letter of Hamill to Norville Bros. fixing a much higher price than that here testified to was, we are persuaded, too remote in point of time to serve as relevant testimony in the cause, and was excluded without error. 22 Corpus Juris, 162.

Defendant interposed numerous special pleas, to a number of which demurrer was overruled. In view of another trial, some brief reference to these rulings should be made. Many of these pleas (2, 3, 16, 22, 23, 24, 27, 33, and 36) have been termed by counsel "syndicate pleas." These pleas should be read, of course, in the light of amended count 9, wherein it is alleged plaintiffs procured the five purchasers named, and defendant's conduct in interposing two objections, and none other, and declining to consummate the sale. And, so considered, they do not controvert these definite averments, but set up that the purchase was not for themselves alone but a syndicate composed of themselves and others; the names of the others not being disclosed. The pleader evidently had in mind the case of Gerding v. Haskin, 141 N. Y. 514, 36 N. E. 601; but that case is no authority for the sufficiency of

these pleas, as here the complaint discloses the plaintiffs produced five named purchasers ready, able, and willing to purchase, and, so long as such purchasers were willing to consummate the trade and be jointly and severally bound for the purchase price, the fact that others, undisclosed, might become interested and share in the enterprise would be of no concern to defendant. No such situation was presented in the Gerding Case, supra.

We think the demurrer to these pleas should have been sustained. No written authority was necessary, as previously noted. Plea 4 so assumes, and demurrer thereto was well taken.

We are of the opinion that, in view of the explicit averments of the complaint, pleas 5, 17, 35, and 37 present nothing that is not available under the plea of the general issue.

The issues actually presented upon the trial by the proof were not complicated and were well defined, and what has been said should suffice for another trial of the cause.

Let the judgment be reversed and the cause remanded.

Reversed and remanded.

ANDERSON, C. J., and BOULDIN and FOSTER, JJ., concur.