# SHELL OIL COMPANY v. GEORGE R. KAPLER AND OTHERS.[1]

December 21, 1951.

No. 35,584.

[1]Reported in 50 N. W. (2d) 707.

*Morley, Cant, Taylor, Haverstock & Beardsley* and *Franklin D. Gray,* for appellant.

*T. H. Wangensteen,* for respondents George R. and Frances E. Kapler.

*Frank E. Clinite,* for respondent Mildred Brabetz, also known as Mildred G. Brabetz.

MATSON, JUSTICE.

Appeal from an order granting a new trial.

Defendants and William F. Brabetz, now deceased, as owners of a gasoline service station in Minneapolis, on April 24, 1939, entered into an agreement with the Shell Oil Company, Inc., whereby they leased the service station to the latter for a term of five years commencing September 16, 1940. Subsequently the lease was renewed for an additional five-year term expiring September 15, 1950. In 1949, the lessee assigned the lease to the Shell Oil Company, a corporation, plaintiff herein. For convenience, the original lessee and its assignee will both be referred to herein as plaintiff.

Paragraphs 15 and 16 of the lease are as follows:

"15. At any time during the term of this lease, and of any renewal thereof, SHELL shall have the option to purchase the above described premises, together with all appurtenances thereto, and all buildings, improvements and equipment thereon, for the sum of Twenty Five Thousand & no/100 Dollars ($25,000.00). Should SHELL elect to exercise said option, it shall give LESSOR notice of said election.

"16. If at any time during the term of this lease, or any renewal thereof, LESSOR desires to sell said property to a prospective purchaser other than SHELL, who is able, willing, and ready to buy said property, LESSOR shall so notify SHELL, giving the name and address of the prospective purchaser and the price and terms of the proposed sale. Said notice shall be accompanied by LESSOR'S affidavit that such prospective sale is in good faith. SHELL shall thereupon have the prior right and option to purchase said property from LESSOR at the price and upon the terms agreed to by said prospective purchaser, which prior right and option shall be in addition and without prejudice to SHELL'S rights under paragraph 15 hereof. If SHELL desires to exercise its option, it shall so notify LESSOR within fifteen (15) days after SHELL

has received from LESSOR the aforesaid notice of LESSOR'S intention to sell said property to a third party. The right of SHELL to purchase at any offered price shall be a continuing right during the existence of this lease, or any renewal thereof, whenever LESSOR, or any successor in title, may desire to sell said property. SHELL'S failure to exercise any option granted by the provisions of this paragraph shall not in any way affect this lease, SHELL'S rights under paragraph 15 hereof, or its right to the estate herein created."

On August 7, 1950, plaintiff sent to defendants a written notice of exercise of the option to purchase the premises, buildings, and equipment for $25,000 as granted in paragraph 15 of the lease. On August 11, 1950, defendants sent plaintiff written notice that they (defendants) had a prospective purchaser, Robert Grennan, who was ready, willing, and able to pay $35,000 for the leased premises, and that they desired to sell under paragraph 16 of the lease.

Defendants contended that plaintiff must either meet Grennan's good-faith offer or allow defendants to sell under paragraph 16. Plaintiff asserted, however, that it had exercised its option under paragraph 15 and commenced an action for specific performance. The prospective purchaser, Grennan, personally had only $100 to apply on the purchase price, but testified that he could borrow $10,000 from his father and brother, and that he expected to raise the additional $25,000 from the Pure Oil Company, which, in the event of his purchase, was interested in securing a lease to the station. Grennan had no express agreement with the Pure Oil Company, but had carried on negotiations with a rental representative of that company who testified that he was reasonably sure that his company would be willing to finance Grennan to the extent of $25,000.

In answer to five special interrogatories, a jury specifically found:

(1) That the decedent, William F. Brabetz, had been present at a meeting of the parties in 1939 when a conversation was had as a preliminary to a renewal of the lease;

(2) That plaintiff's representative had *not* told defendants, as a preliminary to renewal of the lease, that defendants under paragraph 16 could receive an offer of purchase *at any time during the term of the lease,* and that plaintiff would have to meet such offer if it wished to purchase the property;

(3) That Grennan had in good faith made defendants an offer of $35,000;

(4) That Grennan was *not* ready, willing, and able to buy said property for cash with the assistance of the Pure Oil Company; and

(5) That the Pure Oil Company had never agreed to loan Grennan $25,000 for the purchase of the property.

With the aid of the jury's determinations, the trial court made specific findings:

(1) That plaintiff, by notice mailed to defendants on August 7, 1950, had duly exercised the option granted by paragraph 15 of the lease and had thereby created a contract with defendants for the purchase and sale of the property, and that defendants had refused to convey the property to plaintiff pursuant thereto, although the latter was ready, able, and willing to pay the agreed sum of $25,000;

(2) That Robert Grennan, the prospective purchaser designated in defendants' notice mailed to plaintiff on August 11, 1950, was not at the time of the giving of such notice, or at any time subsequent thereto, ready and able to buy the property for $35,000 cash, although his offer was made in good faith.

Pursuant to these findings, the trial court concluded, as a matter of law:

(1) That defendants' notice to plaintiff of the proposed sale to Grennan was of no legal effect;

(2) That defendants had breached the contract created by plaintiff's exercise of the option under paragraph 15; and

(3) That plaintiff had no adequate remedy at law and was entitled to a judgment of specific performance for a conveyance of the premises.

The trial court, however, upon defendants' motion for amended findings (and for judgment notwithstanding the jury's answers to the interrogatories) or a new trial, granted a new trial exclusively for errors of law occurring at the trial. These alleged errors consist of:

(1) The denial to defendants of the right to introduce expert testimony that the premises were reasonably worth $40,000 in 1950; and

(2) That the trial court erred in submitting to the jury the interrogatory as to whether William F. Brabetz, decedent, had been present at a meeting of the parties in 1939.

It is from this order granting a new trial that plaintiff has appealed.

■ In granting a new trial, the district court was of the opinion that its exclusion of evidence to show that the premises were reasonably worth $40,000 in 1950 was prejudicial error with regard to the issue of whether Grennan was able to command the purchase price. Although, as found by the jury, Grennan had obtained no binding commitment from the Pure Oil Company that it would loan him $25,000 upon the premises to be purchased, the trial court apparently assumed that evidence of a 1950 valuation of $40,000 would go to establish or enhance the probability that he could borrow the requisite cash. Upon the particular facts of this case, in the light of the legal principles which control in determining a purchaser's financial ability to buy, we must hold that evidence of the 1950 valuation was immaterial and that its exclusion was not prejudicial.

Rules for testing a purchaser's financial ability to buy are not to be reduced to any unyielding formula, but must be flexible enough to accomplish their purpose according to the particular facts of each case. In ascertaining the rules reflected by an endless variety of cases, it is particularly important to bear in mind that no decision is authoritative beyond the scope of its controlling facts. Difficulty in both stating and applying the rules stems

principally from a failure to keep in mind that *their purpose*—the protection of good-faith sellers as well as of bona fide purchasers, brokers, and other persons similarly situated—*is to establish a purchaser's financial ability to buy with reasonable certainty.* A purchaser may not have the necessary cash in hand, but that alone, it is recognized, does not disqualify him if he is otherwise so situated that he is reasonably able *to command the requisite cash at the required time.* On the other hand, the seller is not required to part with his property to a purchaser whose financial ability rests upon nothing more than shoestring speculation or upon attractive probabilities which fall short of reasonable certainty. In short, the rules are designed to protect the seller by binding him to a sale only where there is a reasonable certainty of the purchaser's financial ability to pay and, on the other hand, to protect the purchaser—and persons similarly situated—from a technical, insubstantial, or sharp-dealing disqualification.

■■■■ Generally speaking, a purchaser is financially ready and able to buy: (1) If he has the needed cash in hand, or (2) if he is personally possessed of assets—which in part may consist of the property to be purchased—and a credit rating which enable him with reasonable certainty to command the requisite funds at the required time,[2] or (3) if he has definitely arranged to raise the necessary money—or as much thereof as he is unable to supply personally—by obtaining a *binding commitment* for a loan to him for that purpose *by a financially able third party,* irrespective of whether such loan be secured in part by the property to be purchased.[3] Although no precise line of demarcation between the

---

[2]See, Hersh v. Garau, 218 Cal. 460, 23 P. (2d) 1022; Hays v. Goodman-Leonard Realty Co. 146 Miss. 766, 111 So. 869; 12 C. J. S., Brokers, § 85(b); Garrisi v. Kass, 201 Mich. 643, 167 N. W. 833; Delaware Apartments, Inc. v. John J. Monaghan Co. (Del.) 69 A. (2d) 242; Espalla v. Lyon Co. 226 Ala. 235, 146 So. 398; Perper v. Edell, 160 Fla. 477, 35 So. (2d) 387; Ramsdell v. Krehmke, 95 Cal. App. 195, 272 P. 333.

[3]See, Pellaton v. Brunski, 69 Cal. App. 301, 231 P. 583; Walton v. Hudson, 82 Ohio App. 330, 79 N. E. (2d) 921; C. O. Frick Co. v. Baetzel, 71 Ohio App. 301, 47 N. E. (2d) 1019; McCabe v. Jones, 141 Wis. 540, 124 N. W.

application of the second and third divisions of the above rule can be laid down for all cases, it is clear—in the light of the purpose of the rule—that where the purchaser relies primarily, not upon his own personal assets, but upon the proceeds of a contemplated loan or loans to be made to him by a third party, he is financially able to buy *only* if he has a *definite and binding commitment* from such third-party loaner. Even though the third party is financially able, his promise is of no avail unless made for an adequate consideration. A purchaser who personally has little, if any, cash or other assets must establish that the financial crutches to be loaned him by others are both legally and financially dependable.

In the instant case, Grennan personally possessed only $100 of the $35,000 cash required. He had no other assets. He was primarily, if not entirely in a practical sense, relying upon loans to be obtained from third parties. Even if we assume that the evidence establishes that he had a binding commitment for a $10,000 loan from his father and brother, he was still wholly dependent upon others for $25,000, or slightly over 70 percent of the purchase price. Under the circumstances, he could establish his ability to command the requisite cash at the required time only by showing that he had a definite and binding commitment from a financially able third party. This he did not do. In the absence of such a binding third-party commitment, he could not establish with reasonable certainty his ability to buy through any mere showing that his prospects for borrowing money were encouraging by reason of the valuation of the property he hoped to purchase. It follows that evidence of the 1950 valuation was immaterial, and no prejudice resulted from its exclusion so as to justify the granting of a new trial. As to the credibility of the witnesses on other issues, evidence of the 1950 valuation had no material bearing.

◼ Defendants, upon the authority of Grosse v. Cooley, 43 Minn. 188, 45 N. W. 15; Sherwood v. Rosenstein, 179 Minn. 42, 228

486; Suhre v. Busch, 343 Mo. 170, 120 S. W. (2d) 47; 12 C. J. S., Brokers, § 85(b); 8 Am. Jur., Brokers, § 175; 2 Mechem, Agency (2 ed.) § 2441; Annotation, 1 A. L. R. 528; 7 Univ. of Detroit L. J. 35-37.

N. W. 339; and Horrigan v. Saeks, 187 Minn. 115, 244 N. W. 545, allege that the jury should have been instructed that a purchaser is presumed to be solvent[4] and able to perform the obligations of his contract. They are in error. The limited function of a presumption as a procedural device has been pointed out with clarity in a number of Minnesota decisions and will not be discussed here.[5] It is enough to point out that a presumption is merely a procedural device for controlling the burden of going forward with the evidence and that it has no additional function other than the limited one of dictating the decision *where there is an entire lack of competent evidence* to the contrary; the very moment substantial countervailing evidence appears from any source, it vanishes completely, and the case is to be decided by the trier of fact as if the presumption had never existed. In the instant case, the presumption wholly disappeared in the face of opposing evidence.

■ Although not urged as error in defendants' motion, the trial court has expressed some doubt as to the propriety of its submission to the jury of an interrogatory as to whether William F. Brabetz, deceased, was present in 1939 when the defendants met with plaintiff's representative, Eugene W. Sandker, to discuss the renewal of the lease. In answer to this interrogatory, the jury did find that decedent was present, and in answer to a second interrogatory it found that Sandker had made no misrepresentation to the defendants. If the jury had found that a misrepresentation had in fact been made, then it would have been necessary for the trial court to know if decedent was present, because, if he was present, it would then, pursuant to M. S. A. 595.04, have been prej-

[4]As to distinction between *solvency* and *ability to buy*, see Colburn v. Seymour, 32 Colo. 430, 76 P. 1058, 2 Ann. Cas. 182.

[5]See, Ryan v. Metropolitan L. Ins. Co. 206 Minn. 562, 289 N. W. 557; Ogren v. City of Duluth, 219 Minn. 555, 18 N. W. (2d) 535; Donea v. Massachusetts Mut. L. Ins. Co. 220 Minn. 204, 19 N. W. (2d) 377; Koenigs v. Thome, 226 Minn. 14, 31 N. W. (2d) 534; Ammundson v. Falk, 228 Minn. 115, 36 N. W. (2d) 521, 7 A. L. R. (2d) 1318; Del Vecchio v. Bowers, 296 U. S. 280, 56 S. Ct. 190, 80 L. ed. 229; Am. L. Inst., Model Code of Evidence, Rule 704, *comment b.*

udicial error for the trial court to refuse to strike as inadmissible the testimony of the other parties to the conversation who were interested in the outcome of the action. Pomerenke v. Farmers L. Ins. Co. 228 Minn. 256, 36 N. W. (2d) 703, and cases therein cited. It follows that the interrogatory was properly submitted to the jury, and there was no error.

■ Aside from the alleged errors of law which the trial court specified as the exclusive grounds for granting a new trial, defendants by their blended motion further asserted that specific performance of the contract ought to have been denied because of inequity and hardship and also on the alleged ground that defendants were induced to enter into the contract by reason of a material misrepresentation by plaintiff as to defendants' rights under paragraphs 15 and 16. These additional grounds properly relate not to the granting of a new trial, but to that part of their motion upon which the trial court has not acted, namely, the request for amended findings and conclusions of law. As an appellate court, we do not make or amend findings or even direct that it be done where the facts are in dispute. Where, however, any issue is settled as a matter of law by the record, the case having been fully developed at the trial, this court will determine such question of law and thereby avoid the delay and expense of further litigation. Long ago we adopted the policy of determining the merits whenever it could be done with due regard to the limitations arising from the nature of our appellate jurisdiction.[6]

As already noted, defendants contend that specific performance should have been denied because defendants were induced to enter into the lease by reason of a material misrepresentation alleged to have been made by Mr. Sandker, plaintiff's representative, as to

[6]Penn Anthracite Min. Co. v. Clarkson Sec. Co. 205 Minn. 517, 287 N. W. 15; Dwinnell v. Minneapolis F. & M. Mut. Ins. Co. 97 Minn. 340, 106 N. W. 312; Gordon & Ferguson v. Doran, 100 Minn. 343, 111 N. W. 272, 8 L.R.A.(N.S.) 1049; First Nat. Bank v. Towle, 118 Minn. 514, 137 N. W. 291; Droege v. Brockmeyer, 214 Minn. 182, 7 N. W. (2d) 538; State ex rel. Spurck v. Civil Service Board, 226 Minn. 253, 32 N. W. (2d) 583; 1 Dunnell, Dig. & Supp. §§ 428, 429.

their rights under paragraphs 15 and 16. The contention is without merit, in that the jury upon conflicting evidence has specifically found that no such misrepresentation had been made. See, Ross v. Carroll, 156 Minn. 132, 135, 194 N. W. 315, 316.

By their blended motion, defendants assert that specific performance in the exercise of a sound discretion ought to have been denied, because the contract is inequitable and to enforce it will result in undue hardship to defendants. The inequity and hardship is said to arise from the increase in the value of the property and the depreciation in value of money *since the lease agreement was entered into by the parties.* It is the general rule that ordinarily the fairness of a contract is to be determined in the light of the circumstances that existed at the time of its making rather than by the effect of subsequent events which intervene before specific performance is sought. Adequacy or inadequacy of consideration for the property sold is to be determined as of the inception of the contract rather than according to the increased or decreased value of the property at the time of trial. It is recognized in this jurisdiction and elsewhere that the hardship of performance of a contract arising from subsequent increase—or decrease—in the value of the property, in the absence of fraud or bad faith in the inception of the contract, is no reason for refusing specific performance.[7] In the Ross case, in discussing when courts may refuse specific performance on the ground that a contract is inequitable and unconscionable, we said (156 Minn. 135, 194 N. W. 316):

"* * * But they cannot do so arbitrarily; nor because they deem the contract unwise; nor because subsequent events disclose that it will result in a loss to the defendant. To justify refusing specific performance on this ground where there is no mistake and the contract was deliberately entered into, it must appear that the de-

[7]Ross v. Carroll, 156 Minn. 132, 194 N. W. 315; Pike Rapids Power Co. v. Schwintek, 176 Minn. 324, 223 N. W. 612. See, Stauch v. Daniels, 240 Mich. 295, 215 N. W. 311; Baller v. Spivack, 213 Mich. 436, 182 N. W. 70; Larson v. Smith, 174 Iowa 619, 156 N. W. 813; Annotation, 11 A. L. R. (2d) 390, 406.

fendant has been misled and overreached to such an extent that the contract is unconscionable. Defendant is confronted by the fact that the jury by a special verdict declared that her charges of fraud and misrepresentation were unfounded, and that the court adopted this verdict as a part of its findings and found all other issues in favor of plaintiff."

In the instant case the jury, as already noted, by its special verdict negatived the existence of any fraud or misrepresentation. Under the circumstances, it cannot be said that the option provisions were inequitable when the agreement of lease was executed.

Defendants cite the case of Willard v. Tayloe, 75 U. S. (Wall.) 557, 19 L. ed. 501, as sustaining the proposition that specific performance should be denied when through inflation the value of money has depreciated. In that case, strict enforcement of an option to purchase given in 1854, when gold and silver coin was the only legal tender, was denied in 1864, when depreciated paper currency had been made legal tender; *but the court did provide that plaintiff should have specific performance if he tendered the purchase price in gold or silver.* In other words, the court recognized that the parties at the inception of the contract had not contemplated that payments might be made in an entirely different medium of exchange. There are, of course, a number of cases where contracts providing for payment in Confederate currency were denied specific performance subsequent to the Civil War when such currency had become worthless. See, Annotation, 11 A. L. R. (2d) 446. Clearly, these decisions involve factual situations wholly different from that of the instant case, wherein specific performance was properly granted.

We find it unnecessary to pass upon the question whether plaintiff's exercise of its option under paragraph 15 precluded defendants from thereafter exercising any right of sale under paragraph 16.[8]

The order of the trial court is reversed.

Reversed.

[8]See, Gassert v. Anderson, 201 Minn. 515, 276 N. W. 808.