DUMBAULD, District Judge:
 

 Appellant (ITT) on February 15, 1979, made a loan to Stephen Alexander Cooley, an entertainment promoter, and two corporations operated by him. All three debtors have subsequently become bankrupt. The lender got a detailed financial statement and credit check on the debtors and on one David J. Harris, who as a matter of friendship became guarantor on the loan. He refused, however, to sign ITT’s standard printed lengthy “boiler-plate” guaranty form, but had a law partner negotiate on his behalf with ITT’s lawyer a typewritten addition or non obstante clause limiting his liability to the liability of the borrowers under a note of even date, and requiring any sums paid by them to ITT to be applied against the note. Harris’s guarantee was to be unsecured and enforceable only to the extent that the liability of the borrowers under the note was valid and enforceable.
 
 [1]
 
 Harris also took an indemnification agreement, and has foreclosed on Cooley’s house to protect himself on this and another bank loan of which he was guarantor. He also formed a corporation known as DJH, Inc. to monitor proper application of the funds from the ITT loan to the conduct of Cooley’s business.
 

 In addition to the Harris guarantee which was the real security upon which ITT based the loan (his net worth was more than the amount lent) ITT unilaterally, as an afterthought, and without negotiating with anyone, prepared a guaranty on their standard form to be signed by Cooley’s wife Virginia (a student nurse) and his mother (a retired telephone operator). One Shela Baird, of ITT’s credit department, procured presentation of the guaranty document to the Cooley women by one Leslie Taylor, an employee of Alex Cooley. This document was not accompanied by any of the cognate papers setting forth the terms of the loan which the ladies were being asked to guarantee. It was “open-ended” and did not specify any dollar amount of liability under the loan. (Mr. Harris, in the additional typewritten paragraph which he insisted upon including in the guaranty which he signed, specified that he was to be liable only for the note of even date in the amount of $200,545.92).
 

 Virginia and Frances Cooley did sign (without reading it) the document brought to them by Leslie Taylor, who had from time to time brought papers which Alex Cooley wanted them to sign. They supposed this was another such document coming from their husband or son, and it was their
 
 *1561
 
 practice to sign such papers routinely, relying upon Alex’s business judgment.
 

 They did not know, when Leslie Taylor brought this particular guaranty document, that she was ITT in sheep’s clothing. They did not know that ITT’s Baird, rather than Alex Cooley, wanted them to sign, and was “short-circuiting” normal channels by taking it directly to the women rather than leaving it at Cooley’s office for his scrutiny and approval before it was sent on to them for signature. Had they known it was ITT who wanted them to sign, they would not only have read it but would have withheld action until after consulting Alex.
 

 On April 30, 1979, an extension agreement was executed. On this occasion the same deceptive procedure was again employed of having Leslie Taylor, as ITT in sheep’s clothing, bring the document to Virginia Cooley and Frances Cooley to procure their signatures.
 

 On these facts the District Court correctly found that the ladies had been “misled and overreached to such an extent that the contract is unconscionable.” He properly concluded, after careful consideration of all the circumstances, that “enforcement of the guaranty agreements against the Cooley women would lead to an unconscionable result.”
 

 In vain does able counsel for ITT contend that “unconscionability” is a term of art coined by the framers of the Uniform Commercial Code and is there confined to sales contracts and consumer purchases.
 
 [2]
 
 Courts of equity have long been wont to relieve against every form of fraud and artifice and sharp practice or deception.
 

 As well stated in appellee’s brief (p. 8): ITT induced them through chicanery into providing their signature and ITT did not
 

 have Leslie Taylor deliver to the Appel-lees the documents describing the loan they were guaranteeing .... The doctrine of unconscionability applies to circumstances such as these where it would be grossly inequitable to allow ITT to benefit from its own misleading conduct .... It is undisputed that the Appellees’ (sic) did not read the agreements because of the artifice of the appellant .... The Supreme Court defined an unconscionable contract in
 
 Hume v. United States,
 
 132 U.S. 406 [10 S.Ct. 134, 33 L.Ed. 393] (1889) by restating the common law of England from the previous century.
 
 Shell Oil Company v. Kapler,
 
 235 Minn. 292, 50 N.W.2d 707 (1951), the decision cited by the District Court in granting Appellee’s Motion for Summary Judgment, is based upon general contract principles of inequity and unconscionability, not the Uniform Commercial Code. Because § 2-302 of the Uniform Commercial Code evolved from a widely accepted doctrine, the trend has been to expand the scope of its application rather than to limit it.
 
 [3]
 

 For the foregoing reasons the judgment of the District Court is
 

 AFFIRMED.
 

 [1]
 

 . By virtue of this language Harris claimed discharge because the debtors had been discharged by bankruptcy; and also because the actual note signed by the borrowers was not prepared and executed until the next day, February 16, 1979, rather than being of even date as described in the guaranty. ITTs suit against Harris required resolution of disputed fact questions and went over for trial when the motion for summary judgment on behalf of Cooley’s wife and mother was granted by the District Court.
 

 [2]
 

 . Appellant’s unopposed “Motion for Enlargement” requesting permission to file an out of time brief was granted.
 

 [3]
 

 . Appended to appellees’ brief in the District Court is an article by Irving Younger, “A Judge’s View of Unconscionability,” 5 Uniform Commercial Code Journal, 348 (1976), where the author says: “The phenomenon of unconscionability is considerably older than Section 2-302 of the Uniform Commercial Code. People are rascals (on the whole), and so far as long as there have been contracts, there have been unconscionable contracts.” In a footnote the author cites Ellinghaus, “In Defense of Un-conscionability,” 78 Yale L.J. 757 (1969).