In re ESTATE OF Sara Edith
BEECHAM, a.k.a. Edith
Beecham, Deceased.

No. CX–84–550.

Supreme Court of Minnesota.

Dec. 27, 1985.

Raebern B. Hitchcock, St. Paul, for Alice Ann Beecham.

Edward F. Kautzer, St. Paul, for Estate.

KELLEY, Justice.

Alice Beecham filed a claim against the estate of her mother-in-law, Sara Edith Beecham, for personal services rendered to the decedent during her lifetime. The trial court awarded judgment of $32,000. The court of appeals reversed on the grounds that the services rendered were gratuitous.[1] We reverse.

Sara Edith Beecham ("Edith") died in January, 1983, at the age of 91. Her will, dated September 20, 1976, gave $1,500 and certain life insurance proceeds to her only son, Raymond William Beecham ("Bill"). The will divided the residue of her estate equally among four grandchildren, her son's children by his first marriage. Nothing was left to Alice Ann Beecham ("Alice"), Bill's second wife, who had cared for her mother-in-law for the last 6½ years of Edith's life.

Alice filed a claim based in quasi contract against Edith's estate for $44,400 for nursing and personal care rendered in Alice's home. She claimed $40,000 for care given to Edith Beecham for 80 months; $3,500 for seven months of care to Joseph Beecham, Edith's husband who had predeceased her; and $900 to replace carpet allegedly ruined by the decedent as the result of her bodily incontinence.

Alice married Bill in 1974. Bill's parents came to live with them at their home in St. Paul two years later. When his wife was hospitalized for a bladder condition, Joseph Beecham, Bill's father, who was senile and had trouble walking, moved in with his son and daughter-in-law in May, 1976. Six months later he died at the age of 89. Edith Beecham, then 85, moved in with her son and daughter-in-law on May 19, 1976, when she was released from the hospital. She continued to live with them until her death in January, 1983.

According to Alice Beecham, the only other place for the elderly couple to go was into a nursing home. Edith moved into two bedrooms on the first floor, converting the second bedroom into a sitting room. She contributed approximately $500 towards installation of a half-bath on the second floor of the Beechams' house. In addition, she voluntarily contributed an average monthly sum of $600 which her son deposited into a checking account used for general household expenses. Both Bill and Alice were retired but did conduct a small mail order business from their home.

Alice Beecham did all the cooking, cleaning, ironing and laundry for her mother-in-law for 6½ years. Alice testified that her mother-in-law had a "leaking problem" and did not want to use a catheter. The cleaning and laundry involved much extra work because Edith not only had a bladder condition, but also had a bowel condition that caused staining and odors. Alice hired a cleaning woman to assist her during the

1. *In re Estate of Beecham,* 361 N.W.2d 86 (Minn. App.1985).

last year and a half of her mother-in-law's life. In addition to running the household, Alice made trips to the library at least weekly to get books for Edith, who was an avid reader. She "took care of" her mother-in-law's hair and had to remind her to take prescribed medications. She took Edith to doctors' appointments. Occasionally Edith would "tip" her $5 or $10 for such trips. Although she had no training in nursing, Alice cleaned Edith's ears several times daily to care for recurrent ear problems. Edith did not help with any household chores. During the 80 months she lived with them, Alice and Bill took only one two-week vacation and one two-day trip.

Sandra Jean Olmsted, R.N., nursing supervisor at St. Paul Upjohn Health Care Services, testified on the value of Alice Beecham's services to the decedent. She testified a home health aide placed in the Beechams' home from May 1976 to January 1983 would have been paid $85,818.50. Upjohn would have billed the client $138,063 for these services. Home health aides provide the most basic level of care and require no formal training or certification. Nurse Olmsted also reviewed Edith's medical records. She testified Edith had an atonic neurogenic bladder which resulted in chronic incontinence. Edith required a low-fat diet and took a variety of medications for her illness.

The four grandchildren, who were residual legatees under Edith's will, contributed no money or services toward the care of their grandparents during the last years of their lives. Only two of the four grandchildren testified. Each had visited their grandmother for short periods of time from two to four times yearly during the 6½ years she was being cared for by Alice in Alice's home. At trial, the estate (the grandchildren) contended Edith was not a burden on Bill and Alice Beecham, and particularly not on Alice. Moreover, they asserted her presence in the Beecham home did not significantly increase household expenses. In general, the position of the grandchildren was that Alice voluntarily did the cooking, cleaning, extra house duties and personal nursing-type care of Edith because "it was her nature to do them."

The trial court's findings of fact included:

Except for an occasional five or ten-dollar tip for expenses for transportation, the claimant, Alice Ann Beecham, received nothing from Edith Beecham.

6. The evidence indicated that Edith Beecham had numerous physical problems and that Alice Beecham on an every-day basis provided medical care, nursing care, transportation, household duties and chores because of the inability of Edith Beecham to provide those services for herself. No assistance of any kind was rendered to the Beechams by the grandchildren.

7. There was no oral or written contract between Alice Ann Beecham and the elderly Beechams regarding personal service.

It is elementary that a trial court's findings of fact are not to be set aside unless clearly erroneous. Minn.R.Civ.P. 52.01 (1984). An appellate court will not overrule a trial court's factual findings unless, upon a review of the entire evidence, the appellate court is left with a definite and firm conviction that a mistake has been made. *State v. Paulson*, 290 Minn. 371, 188 N.W.2d 424 (1971).

The Court of Appeals, in reversing the trial court, relied on the presumption of gratuity which arises when, absent agreement to the contrary, services are rendered by one family member to another. *See, e.g., In re Estate of Anderson*, 157 Minn. 217, 197 N.W. 671 (1923). Historically, the presumption has been applied frequently to deny claims by relatives against the estates of family members. *See, e.g., In re Estate of Klessig*, 153 Minn. 27, 189 N.W. 424 (1922); *Beneke v. Estate of Beneke*, 119 Minn. 441, 138 N.W. 689 (1912). *See also*, Annot. 7 A.L.R.2d 8 (1949).[2] However,

---

2. The court has applied the presumption to rela-    tives, including in-laws, who lived together in

claimants have not been uniformly nor absolutely deprived of compensation by application of the presumption. If claimants can produce sufficient evidence to prove an implied contract and to overcome the presumption, they have been successful in recovering for family services rendered to relative decedents. *See, e.g., Hage v. Crookston Trust Co.,* 199 Minn. 533, 272 N.W. 777 (1937); *In re Estate of Havenmaier,* 163 Minn. 218, 203 N.W. 958 (1925). In other early cases, the court upheld lower court decisions not to apply the presumption of gratuity. *See, e.g., Neutgens v. Rehmann,* 170 Minn. 499, 212 N.W. 943 (1927) (presumption termed not controlling under evidence of case in which daughter cared 12 years for her mother); *In re Estate of Johnson,* 170 Minn. 451, 212 N.W. 815 (1927) (agreement to compensate implied where daughter cared for partially paralyzed, incontinent mother).

Both the court of appeals and the trial court relied upon *In re Estate of Tilghman,* 240 Minn. 494, 61 N.W.2d 743 (1953), but each arrived at a different conclusion. Thus, we must first address the effect of the presumption of gratuity; secondly, whether the presumption can be overcome by evidence; and, thirdly, within the rules of *Tilghman* whether the trial court's findings on the salient issues were clearly erroneous.

*Tilghman* involved a daughter's claim against her father's estate for personal services rendered to her father. She had cared for her invalid father in her home during the last three years of his life. He was partially paralyzed by a stroke and had suffered a heart attack. *Id.* at 495, 61 N.W.2d at 745. The daughter had been taken from her father's home at 16 months of age to be raised by other relatives when her mother died. *Id.* at 494–95, 61 N.W.2d at 744–45. In the intervening 50 years before she took her father into her home, there was no record that her father had either supported or cared for her. *Id.* at

495, 61 N.W.2d at 745. In denying the daughter's claim for services, the trial court applied the presumption of gratuity for personal services rendered within a family. In reversing the trial court's determination that the daughter had produced insufficient evidence of an express or implied agreement to pay for services to overcome the presumption of gratuity, this court took note that automatic application of the presumption can end in harsh, inequitable results. To obviate such inequities, we directed trial courts make inquiry into the facts in each case to determine whether there was a "family relationship" beyond mere kinship.

Plaintiff's right to recover is dependent upon all the facts and all the circumstances surrounding the relationship as it exists here; the manner in which services were performed and support furnished; and under what conditions, if any, mutual benefits and reciprocal duties are shown to exist or not to exist. If there was no interchange of reciprocal duties and mutual benefits, the presumption against payment would not obtain. *Id.* at 499, 61 N.W.2d at 747. Using this analysis, the court found there was no such family relation in *Tilghman. Id.* at 500, 61 N.W.2d at 748. In reaching this conclusion, the court noted the 50-year absence of the father, his incapacitated condition, and the lack of reciprocal services between father and daughter. *Id.* We decided the presumption of gratuity should not apply and the daughter's claim should come under the general rule that where meritorious services have been rendered by one and accepted by another, the law implies a promise to pay. *Id.* at 501, 61 N.W.2d at 748.

As in *Tilghman,* the claimant here asserts neither an oral nor a written contract for personal services rendered to her inlaws. Her claim is an equitable one based on quantum meruit or contract implied in fact. The trier of fact ordinarily deter-

the same household and render services or support to one another. *In re Estate of Anderson,*

157 Minn. 271, 197 N.W. 671 (1923).

mines whether the evidence in the form of conduct and statements of the parties supports a finding of contract implied in fact. *Bergstedt, Wahlberg, Berquist Associates, Inc. v. Rothchild,* 302 Minn. 476, 479–80, 225 N.W.2d 261, 263 (1975).

■ Our examination of the facts and circumstances of this case persuades us that the trial court's determination that the presumption of gratuity had been overcome was not clearly erroneous. Had there been no evidence other than family relationship, we agree that the presumption would deprive Alice of her claim. It is, of course, elementary that a presumption is not evidence, although its existence does have the effect of evidence until and unless the contrary is sufficiently proved by the evidence. 9 Wigmore, Evidence § 2490, 2491 (Chadbourn rev. 1981). *See Ogren v. City of Duluth,* 219 Minn. 555, 564, 18 N.W.2d 535, 540 (1945); *Ryan v. Metropolitan Life Insurance Co.,* 206 Minn. 562, 567, 289 N.W. 557, 560 (1939). But once evidence is produced sufficient to overcome the presumption, it ceases to exist in the sense of having any evidentiary value. *Kath v. Kath,* 238 Minn. 120, 124, 55 N.W.2d 691, 693–94 (1952); *Shell Oil Co. v. Kapler,* 235 Minn. 292, 300, 50 N.W.2d 707, 713 (1951).

In our view, there were sufficient facts to support the trial court's finding of an implied contract. Alice rendered around the clock care for an elderly, chronically incontinent woman, seven days a week for nearly seven years. Those types of services are beyond services usually and ordinarily gratuitously rendered to family members. Particularly is that true when the fact is considered that Alice knew her in-laws a very short time before taking them into her home, had no blood relationship to them, and accepted the onus for her mother-in-law's extended care. Admittedly, neither the degree of kinship nor the length of family relationship is dispositive on the issue. However, they are relevant and when considered in the light of qualitative and quantitative care rendered, they lend support to the trial court's finding of the existence of an implied contract under the *Tilghman* analysis. Moreover, the absence of reciprocity of services between Alice and her mother-in-law is an important factor under the *Tilghman* analysis in the determination of whether the presumption has been overcome. *Id.* 240 Minn. at 499, 500, 61 N.W.2d at 747. Here, Edith furnished no services in the home of Alice. Alice received nothing from Edith except occasional "tips" for transporting to doctor's appointments. We agree with the trial court's finding of insufficient proof that Alice's services were paid from the monthly sum Edith gave her son. Indeed, the amount of these sums is more indicative of board and room than of remuneration for the types of services rendered by Alice.

From the foregoing, we conclude that the trial court's findings are not clearly erroneous.[3] Without doubt Edith rendered intangibles to Alice such as companionship, affection and respect, but here Alice's duties were greatly disproportionate to those contributions which were not, in the legal sense, reciprocal so as to negate an implied promise to pay for the rendered services. Alice sustained her burden of proving the existence of an implied contract.

■ The trial court awarded Alice $32,000 for these years of unusual services from an estate appraised at $166,000. This award was clearly supported by evidence offered by Alice in the light of the undisputed testimony of Sandra Olmsted, R.N. Additionally, the trial court's determination that her claims for services rendered Joseph Beecham were barred by the statute of limitations was correct. Also, the finding that Alice had failed to meet her bur-

---

**3.** The court of appeals inferred benefits to Alice from the monthly sums paid her husband. Had the trial court made the inference, we might well agree that its decision was not clearly erroneous. However, inferences to be drawn from evidence are for the trier of fact, and decisions based thereon should be upheld by appellate courts absent clear evidence to the contrary that convinces the appellate court with a definite and firm conviction that a mistake has been made. *See State v. Paulson,* 290 Minn. 371, 188 N.W.2d 424 (1971), *Bergstedt, Wahlberg, Berquist Associates, Inc. v. Rothchild,* 302 Minn. 476, 225 N.W.2d 261 (1975).

den of proof with respect to her claim for replacement of the carpeting was not clearly erroneous.

 In the trial court and the court of appeals, respondent contended that the statute of limitations substantially barred Alice's claims for caring for Edith. The trial court rejected that claim. The court of appeals did not address it because its decision made a decision on this claim unnecessary. We have examined the claim and conclude, as did the trial court, that the claim is meritless.

Having concluded the trial court's findings pass muster under the appropriate standard of appellate review, we reverse the court of appeals and remand to the district court for the entry of judgment.