Llewellyn K. JONES, Appellant,

v.

AMOCO OIL COMPANY, Respondent.

No. C9–91–1918.

Court of Appeals of Minnesota.

March 31, 1992.

Review Denied May 15, 1992.

Michael D. Quayle, Dudley R. Younkin, Merrigan, Johnson, Quayle & Younkin, Minneapolis, for appellant.

Gary Van Cleve, Larkin, Hoffman, Daly & Lindgren, Bloomington, for respondent.

Considered and decided by RANDALL, P.J., and SHORT and HARTEN, JJ.

## OPINION

HARTEN, Judge.

Appellant Llewellyn K. Jones commenced this action seeking specific performance of a real estate contract or, in the alternative, damages for breach of contract. A jury returned a verdict in favor of Jones and awarded damages of $740,000. Because the trial court found Jones had not obtained suitable financing as required in the contract, it granted JNOV in favor of Amoco. Jones appeals from the trial court's order denying his post-trial motions for

amended findings or a new trial, and, by notice of review, Amoco challenges the trial court's denial of its motion for a new trial on the issue of damages. We affirm.

## FACTS

For 17 years, appellant Jones leased from respondent and operated a full service gas station located in Lilydale. On December 24, 1985, the station was substantially damaged by fire. On March 14, 1987, Jones and Amoco entered into a real estate contract and addendum (the contract) involving the sale of the station property to Jones. Under the contract, Jones was to buy the real estate on which the service station had been situated, for $78,000. Jones made an earnest money payment of $7,800 and was to pay the remaining $70,-200 at the time of closing. Jones was also obligated to rebuild, at his own expense, a full service facility in the "Amoco image" (the improvements) within one year of his taking title to the real estate.

The sale was contingent upon Jones "obtaining suitable financing" to cover the costs of building the new station. The contract provides, in part:

5. *This is further contingent upon Purchaser obtaining suitable financing as determined by market standards, to cover the costs of improvements [rebuilding] set forth in Paragraph 4 above.* In the event Purchaser is unable to obtain financing on or before the date hereinafter set forth, Purchaser shall so advise Seller in writing. *It is agreed that the time granted for securing said financing shall expire two (2) months after delivery of a signed copy of the Real Estate Contract and Addendum thereto to Purchaser or his attorney. In the event Purchaser is unable to obtain said financing, this contract and Addendum thereto shall be null and void and of no further force or effect* and all earnest money herein paid shall be returned to Purchaser.

(emphasis added). The sale was also contingent upon the parties' agreement on the exact specifications of the rebuilt station.

In addition to the loan on the real estate, Jones believed he needed $220,000 to rebuild the station. Jones did not personally have the cash necessary to finance the costs of the improvements and was relying on Signal Bank of West St. Paul to provide all of the financing. Tom Shank, the executive Vice-president in charge of lending at Signal Bank, viewed the financing as a two-step transaction: first, the purchase of the real estate, and then the rebuilding of the station. On May 7, 1987, the bank issued a written commitment for a $70,000 loan to finance the purchase of the real estate. That commitment had a three month expiration clause.

On July 13, 1987, Amoco wrote to Jones regarding the contract:

Please be advised that the time for securing said financing has, at this point, exceeded the two month period set forth in the Addendum. As such, if my office is not provided evidence of suitable financing prior to July 21, 1987 the contract, Addendum thereof, and all other agreements pertaining to referenced subject will be considered of no further effect and all earnest monies shall be returned to Purchaser.

Jones replied by letter dated July 20, 1987, stating that he was "ready, willing and able to close" the deal and requested a date to do so. Jones also noted in the letter that he was under no obligation to disclose to Amoco his financing for the deal.

Over the next 14 months Amoco made preparations for closing, but a closing never occurred. Jones repeatedly failed to fulfill the contingency contained in the contract regarding improvement specifications. It was not until February of 1988 that Jones submitted an acceptable plan. At this point, Amoco contacted Jones and set up a closing date at the end of March of 1988. Again, however, closing did not occur. By letter dated March 28, 1988, Jones notified Amoco that his bank needed two or three more weeks to prepare for closing. The bank had advised Jones that he must furnish to it a "Hazardous Substances Inspection Report" before the bank could consider loaning Jones the money to ac-

quire the real estate. The bank made other demands related to the required inspection and indicated that if more environmental testing were needed, Jones would have to comply at his own expense. The bank also stated that if there was a hazard, Jones would have to take steps to solve the problem.

Amoco demanded that a closing occur by July 29, 1988. Jones finally informed Amoco that the bank was requiring further testing of the property. However, Jones continued to represent that the financing was not a problem. The parties set up a closing for September 29, 1988. At the time of the scheduled closing, counsel for Jones indicated to Amoco's counsel that the bank wanted Amoco to agree to indemnify it should any environmental liability arise. Amoco refused the bank's request. Despite several discussions, the bank and Amoco failed to reach an agreement on this issue.

By letter dated November 30, 1989, Amoco informed Jones that the purchase agreement was terminated and returned Jones' earnest money check. Claiming that he had the requisite financing, Jones sent the check back to Amoco twice. Each time Amoco sent it back to Jones. On April 23, 1990, Amoco entered into an agreement with the City of Lilydale regarding the demolition of the station and the protection of Amoco's rights to rebuild at some later date.

Jones commenced this action for specific performance, or in the alternative, for breach of contract damages. He was allowed to file a supplemental complaint to include a claim of conversion, but his motion to add a claim for punitive damages was denied. The matter was tried to a jury. At the close of Jones' case and again at the close of both parties' evidence, Amoco moved for a directed verdict. The trial court reserved its ruling pending the return of the jury's verdict. By special verdict, the jury found that Jones had obtained "suitable financing to cover cost of the improvement" within the meaning of the contract. The jury also found Jones' damages to be $740,000.

The trial court subsequently issued post-verdict findings and order for judgment granting a directed verdict in favor of Amoco. The parties then brought post-trial motions; Jones seeking amended findings or a new trial, and Amoco seeking a new trial solely on the issue of damages in the event the trial court vacated the directed verdict. Jones appeals from the trial court's order denying his post-trial motions, and, by notice of review, Amoco challenges the court's denial of its motion for a new trial on the issue of damages.

## ISSUES

1. Did the trial court err by finding that Jones failed to obtain suitable financing to cover the cost of rebuilding the service station as required by the terms of the contract?

2. Was respondent Amoco required to follow the statutory cancellation procedures set out in Minn.Stat. § 559.21 (1988)?

3. Did the trial court err by denying Jones' motion to amend his complaint to include punitive damages?

## ANALYSIS

■ Because the directed verdict was granted after all the evidence was submitted and after the jury had delivered its verdict, the granting of the motion is properly reviewed as an award of judgment notwithstanding the verdict (JNOV). *See* 3 Douglas D. McFarland & William J. Keppel, *Minnesota Civil Practice* § 2401 at 464 (2d ed. 1990).

■ Appellate review of a JNOV is bound by the same standards as apply to the trial court. *Macho v. Mahowald*, 374 N.W.2d 312, 314 (Minn.App.1985) *pet. for rev. denied* (Minn. Nov. 4, 1985); *Les Jones Roofing, Inc. v. City of Minneapolis*, 373 N.W.2d 807, 809 (Minn.App.1985). The standard is whether, when the evidence is viewed in the light most favorable to the prevailing party, there is any evidence reasonably tending to support the jury's verdict. *Prichard Bros., Inc. v. Grady Co.*, 436 N.W.2d 460, 463 (Minn.App.1989) *pet. for rev. denied* (Minn. May 2, 1989); *see*

also *Sikes v. Garrett*, 262 N.W.2d 681, 683 (Minn.1977) (JNOV is proper where there is no competent evidence reasonably tending to sustain the verdict).

1. Jones contends that the trial court erred by finding he failed to obtain suitable financing. We disagree.

The jury answered the following special verdict question in the affirmative:

> 1. Did the plaintiff [Jones] obtain suitable financing to cover the cost of the improvement as required by paragraphs 4 and 5 of the first addendum to the contract?

To "obtain suitable financing" means that a buyer is financially ready and able to perform.

> The term "able" refers to the purchaser's financial ability not only to make the initial payment required to meet the terms of the seller, but also to complete the contract of purchase according to its terms.

*ERA Town & Country Realty, Inc. v. TE-VAC, Inc.*, 376 N.W.2d 526, 528 (Minn.App. 1985) (the evidence sustained finding that a real estate broker had produced a purchaser "ready, willing, and able" to purchase the property on terms fixed by the seller and was therefore entitled to collect a commission).

> Generally speaking, a purchaser is financially ready and able to buy: (1) If he has the needed cash in hand, or (2) if he is personally possessed of assets—which in part may consist of the property to be purchased—and a credit rating which enable him with reasonable certainty to command the requisite funds at the required time, or (3) if he has definitely arranged to raise the necessary money— or as much thereof as he is unable to supply personally—by obtaining a *binding commitment* for a loan to him for that purpose *by a financially able third party,* irrespective of whether such loan be secured in part by the property to be purchased.

*Shell Oil Co. v. Kapler,* 235 Minn. 292, 298, 50 N.W.2d 707, 712 (1951) (emphasis in original).

In its instructions to the jury, the trial court read from *Kapler* almost verbatim. The instructions went on to state:

> A binding commitment means one that can be enforced in a court. However, a debtor cannot enforce a commitment in court unless the commitment is in writing, setting [forth] the relevant terms and conditions and is signed by the debtor and the creditor.[1]

In reversing the special verdict of the jury, the trial court found the legal principles set out in *Kapler* controlling. The trial court found: Jones did not have "the cash in hand" needed to meet the requirements of the contract; Jones elected to obtain financing from a commercial lending institution, and he did not look to his own assets to finance the contract; Jones did not prove that he had assets in his own name, nor assets of another over which he had control sufficient to command the required funds at the time required by the contract; and Jones did not have a written commitment from the bank or any other financially able third party to finance the improvements (rebuilding) called for by the contract. Therefore, the trial court reasoned, Jones did not qualify as "financially ready and able to buy" under *Kapler. See id.* at 298–99, 50 N.W.2d at 712–13.

Jones argues that he fits squarely within the second *Kapler* definition of "financially ready and able to buy"—personal possession of assets and a credit rating which enable him to command the requisite funds at the required time with reasonable certainty. He also argues that because he was relying on third parties to loan him money based on his assets and credit rating, he did not need a "definite and binding commitment" from the bank. We disagree.

The purpose of the *Kapler* rule is to establish a purchaser's financial ability to

---

1. This instruction is supported by the Minnesota statute of frauds relating to credit agreements, Minn.Stat. § 513.33, subd. 2 (1988) (a debtor may not maintain an action on an agreement to lend money unless the agreement is in writing, expresses consideration, sets forth the relevant terms and conditions, and is signed by the creditor and the debtor).

buy with reasonable certainty, so as to protect both good faith sellers and bona fide purchasers, and brokers and other similarly situated persons. *Id.* at 297–98, 50 N.W.2d at 712. After the *Kapler* opinion sets forth its three definitions of "financially ready and able to buy", it goes on to state:

> Although no precise line of demarcation between the application of the second and third divisions of the above rule can be laid down for all cases, it is clear—in light of the purpose of the rule—that where the purchaser relies primarily, not upon his own personal assets, but upon the proceeds of a contemplated loan or loans to be made to him by a third party, he is financially able to buy *only* if he had a *definite and binding commitment* from such third-party loaner.

*Id.* at 298–99, 50 N.W.2d at 712–13 (emphasis in original).

■ Jones admitted that he did not personally have sufficient cash or liquid assets to finance the $220,000 cost of the improvements. Jones also testified that he was relying solely on the bank to loan him the money for the improvements and did not intend to contribute any of his personal funds. Therefore, under the second *Kapler* definition, Jones is financially able to buy "only if he has a definite and binding commitment from a third-party loaner." *See id.*

■ Regarding his assets and credit rating, Jones testified that he owned a house located on 14½ acres of property, an outbuilding, an apple orchard of two thousand trees, harvesting equipment including two tractors and a cherry picker, and bees from which he harvests honey. However, a review of the record shows Jones failed to ascribe any specific values to those assets. In its findings, the trial court correctly noted that there was no evidence as to title of the real estate, the total amount of encumbrances on the real estate, or the value of the real estate. There was no evidence of what equity, if any, Jones had in those assets. Furthermore, there was no evidence regarding any other assets Jones might have available to use as securi-

ty for the second stage of the financing, the rebuilding.

Thomas Shank, executive vice president at Signal Bank in charge of lending, reviewed Jones' account at the time of trial. Shank testified that in his opinion, Jones had the requisite assets and credit rating to obtain the loan he requested. However, Shank did not have authority to grant the loan. Shank did not personally work on Jones' account, but instead had assigned Jones' account to Jon Hall. Hall testified he did not have enough information from Jones to determine whether Jones had sufficient assets to get the loan for improvements.

At one point, Jones had obtained a commitment from the bank for $70,000, the amount needed to finance the purchase of the real estate only, the first of two stages of the financing. Although in writing, this commitment was due to expire 90 days from May 7, 1987. Furthermore, Jones admitted that although the bank knew he wanted to borrow an additional $220,000, the amount needed for the improvements, he had not actually submitted a formal application for these additional funds.

An analysis of a potential loan for the improvements had never been performed by the bank. No loan request or proposal had been submitted to the bank committee that possessed the authority to grant the loan for the improvements. Jon Hall testified that although he and Jones had discussed the loan for improvements, because of lack of information, Hall had not even done a "write-up" on the loan, which is ordinarily done in preparation for submission to the loan committee or director's board committee.

In addition to the $70,000 Jones needed for the acquisition of the real estate, he testified that he needed at least $220,000 to rebuild the station. The record does not indicate that the bank was willing to loan the additional $220,000 needed for rebuilding. In fact, the record indicates that the bank had a fear of potential environmental liability which was never resolved.

Jones testified that he was relying on the proceeds of a loan from the bank to finance

this entire transaction. Therefore, even if the trial court erred by finding Jones did not possess assets and a credit rating to enable him to command the requisite funds with reasonable certainty, because he was relying solely upon the proceeds of a loan, *Kapler* indicates he needed a "definite and binding commitment" from the bank. *Id.* There is no evidence of such a commitment by the bank, written or otherwise. We agree with the trial court that Jones failed to obtain suitable financing.

■ 2. Jones argues that Amoco had no right to unilaterally cancel the contract, but rather, was required to follow the statutory procedures set out in Minn.Stat. § 559.21 (1988) (the contract for deed cancellation statute), which includes notice of cancellation. We disagree. Section 559.21 does not apply to all purchase agreements. The test for determining whether the statute applies is:

> whether the agreement is a contract for the conveyance of real estate or any interest therein. This means a contract where both parties are bound by its terms. * * * And ordinarily it must be a contract where * * * either party can require performance by the other. In other words, the agreement must be sufficiently certain and complete in its essential terms that ordinarily specific performance will lie. * * * [W]hen the parties have left open an essential term for further negotiations, the court declines to make a contract for the parties and specific performance will not lie. * * * [T]he inquiry is whether a term essential to the final bargain is left open for further negotiations or is dependent on a contingency.

*Romain v. Pebble Creek Partners*, 310 N.W.2d 118, 122 (Minn.1981) (citations omitted) (procedures of section 559.21 not required where purchase agreement was not finally binding on both parties in all its essential terms: agreement was nullified pursuant to its own terms because the parties failed to reach agreement on security for a note, which was a contingency for completion of the contract itself). "[Section] 559.21 contemplates contracts of actu-

al purchase and not agreements wholly dependent upon some contingency." *Liebsch v. Abbott*, 265 Minn. 447, 454, 122 N.W.2d 578, 583 (1963) (procedures of section 559.21 did not apply because contract performance was contingent upon buyer obtaining a $20,000 mortgage loan).

Here the contract was contingent upon Jones obtaining suitable financing and upon agreement of the parties regarding the specifications for the rebuilding. The evidence shows that the financing contingency was never met by Jones. Therefore, the contract was nullified by its own terms; Amoco was not required to follow the procedures of section 559.21.

■ 3. Jones argues that the trial court erred by denying his motion to amend his complaint to include punitive damages. We disagree. Jones' claim for punitive damages is based upon his conversion claim. The conversion claim was not submitted to the jury. Jones made no objection to the non-submission of this claim. Therefore, Jones cannot challenge on appeal the trial court's refusal to allow him to claim punitive damages. *See Wolner v. Mahaska Indus., Inc.*, 325 N.W.2d 39, 42 (1982) (unchallenged jury instructions are the law of the case and cannot be challenged on appeal). Furthermore, because we affirm the judgment in favor of Amoco, the issue is moot.

## DECISION

The trial court did not err by granting JNOV in favor of Amoco. Because we affirm the trial court, we do not address Amoco's challenge to the trial court's denial of its motion for a new trial on damages in the event of a reversal by this court.

Affirmed.