ORFINGER, J.
Sterling Crest, Ltd. (“Sterling”), a limited partnership, and Royal American Development, Inc. (“Royal American” or “the General Partner”), collectively Appellants, appeal the trial court’s partial summary judgment granting specific performance and compelling the sale of the Sterling Crest Apartments, a 360-unit apartment complex in Orange County, Florida (“the Property”), to Blue Rock Partners Realty Group, LLC (“Blue Rock”). Sterling contends that the trial court erred in granting partial summary judgment because disputed factual issues exist concerning its limited partners’ consent to the sale and whether Blue Rock was-ready, willing, and able *1276 to close the transaction as of the closing date. We agree and reverse.[1]
Joseph Chapman, IV serves as President of Royal American, Sterling’s only general partner. Royal American owns a fifty percent interest in Sterling, while Vita Via, Inc. and Lishil Enterprises, L.P., Sterling’s two limited partners (“the Limited Partners”), collectively own the remaining fifty percent. Dr. Hilary Reich serves as the Limited Partners’ representative for all matters concerning the proposed sale of the Property, Sterling’s sole asset. The limited partnership is governed by a limited partnership agreement, which states that the limited partnership was formed
(i) to acquire and own a parcel of land in Orlando, Orange County, Florida (the “Property”), (ii) to obtain financing to develop and construct apartment buildings thereon, including all improvements related thereto, (iii) to carry on any and all activities related to the Property, including, without limitation of the foregoing, the development and construction of apartment buildings including all improvements related thereto, (iv) to manage, operate, and rent the apartment buildings constructed on the Property in accordance with any and all applicable rules and regulations of any and all governmental agencies, and (v) to carry on any and all business and investment activities incident to the foregoing.
The limited partnership agreement gives the General Partner the authority to enter into negotiations and contracts on behalf of the limited partnership, but the consent of all Limited Partners is required to sell or transfer the Property.[2] Consent is defined in the limited partnership agreement as
the written consent of a Partner, or the affirmative vote of such Partner at a meeting duly called and held pursuant to this [ajgreement, as the case may be, to do the act or thing for which the consent is required or solicited, or the act of granting such consent, as the context may require.
According to Mr. Chapman, he discussed his interest in selling the Property with Dr. Reich in 2012, but Dr. Reich maintains that Mr. Chapman did not discuss the price at that time. In November 2012, Sterling listed the Property for sale. On January 25, 2013, Mr. Chapman forwarded Dr. Reich two e-mails from a broker, summarizing the best and final offers received on the Property. Several days later, Dr. Reich expressed her concerns about the tax implications of the sale via email as well as in a telephone conversation with Mr. Chapman. From January 28, 2013, to February 21, 2013, Dr. Reich exchanged e-mails with Mr. Chapman, seeking a tax analysis and a proposal regarding the distribution of the sale proceeds. She also sought assurance that he would not attempt to sell the Property *1277 without the consent of all of the Limited Partners, which Mr. Chapman refused to do.
Still, according to Mr. Chapman, he had the consent of the Limited Partners to sell the Property when the contract (“the Agreement”) for the sale of the Property to Blue Rock for $27,250,000 was executed on February 11, 2013.[3] In the Agreement, Sterling represented that it had full power and authority to enter into the Agreement, the Agreement did not conflict with the limited partnership agreement, and its partners had authorized and unanimously approved the Agreement. Sterling was also required to “promptly disclose in writing” to Blue Rock any material changes or breaches relating to its representations and warranties.
In a February 21, 2013, telephone call, Dr. Reich informed Mr. Chapman that she did not consent to the sale of the Property. Four days later, she reiterated her lack of consent in two e-mails to Mr. Chapman.[4] In a reply email sent that same day, Mr. Chapman indicated that Dr. Reich had “already made it clear that [she] did not consent to the sale [of the Property].” Dr. Reich perceived this exchange of e-mails as confirmation that Mr. Chapman understood, and was previously aware, that she did not consent to the sale of the Property.
She claimed that Royal American never requested the Limited Partners’ consent and that there was no partnership meeting at which unanimous consent was given to sell the Property. According to Dr. Reich, it was not until February 27, 2013, that she discovered that Mr. Chapman had executed the Agreement with Blue Rock on behalf of Sterling.
When Blue Rock learned of the intra-partnership conflict embroiling Sterling, it filed a five-count lawsuit against Appellants, including a claim for specific performance. Ultimately, Blue Rock filed a motion for partial summary judgment on its claim for specific performance, asserting that there were no material issues of fact in dispute. The trial court granted partial summary judgment in Blue Rock’s favor, finding that the Limited Partners objected only after they permitted the General Partner to enter into the Agreement with Blue Rock. The court reasoned that it was inequitable for Sterling to prevent Blue Rock from completing the purchase of the Property due to its own actions. As a result, the trial court entered a mandatory injunction, requiring Sterling to close on the sale of the Property within ninety days. This appeal follows.
Summary judgment is proper when “there is no genuine issue of material fact *1278 and if the moving party is entitled to a judgment as a matter of law.” Volusia Cnty. v. Aberdeen at Ormond Beach, L.P., 760 So.2d 126, 130 (Fla.2000). As such, a trial court’s ruling on a motion for summary judgment is subject to de novo review. See Aberdeen at Ormond Beach, 760 So.2d at 132-83; Scheibe v. Bank of Am., N.A., 822 So.2d 575, 575 (Fla. 5th DCA 2002). The legal interpretation of a contract is also reviewed de novo. Whitley v. Royal Trails Prop. Owners’ Ass’n, 910 So.2d 381, 383 (Fla. 5th DCA 2005). The intent of the parties governs the contract interpretation and that intent is to be determined from the plain language of the agreement and the everyday meaning of the words used. Id. Because real property is considered unique, money damages to a contract purchaser of real property is an inadequate remedy at law. Henry v. Ecker, 415 So.2d 137,140 (Fla. 5th DCA 1982).
Sterling asserts that under Florida law and the limited partnership agreement, the Limited Partners’ consent was required in order to sell the Property, and whether it had such approval is a disputed issue of fact precluding the partial summary judgment in favor of Blue Rock. In contrast, Blue Rock contends that Royal American had actual, statutory, and apparent authority to execute the Agreement on Sterling’s behalf.
Actual Authority Under the Limited Partnership Agreement
Under the limited partnership agreement, the General Partner could sell the Property only with the consent of all the Limited Partners, represented by Dr. Reich. The Limited Partners could express their approval through written consent, an affirmative vote at a partnership meeting, or by “the act of granting such consent, as the context may require.” In this case, there is no record evidence showing that the Limited Partners gave consent in writing or at a partnership meeting. Whether consent was given by act or through a course of dealing with partnership affairs is far from clear.
In granting the partial summary judgment in favor of Blue Rock, the trial court held that since the Limited Partners had knowledge of the offers and were aware of the ongoing negotiations between Sterling and Blue Rock to effectuate a sale, they consented to the sale by acquiescence or waived their right to consent. We disagree. The sale of the Property is conditioned upon the Limited Partners’ affirmative consent, not the failure to object. “[T]he intent to waive a right must be unmistakably manifested, and is not to be inferred from a doubtful or equivocal act.” Orange Steel Erectors, Inc. v. Newburgh Steel Prods., Inc., 225 A.D.2d 1010, 640 N.Y.S.2d 283, 285 (N.Y.1996).
Statutory Authority
Whether a limited partnership is bound by a general partner’s act depends on if the act is one that occurs in the ordinary course of the limited partnership’s activities. See § 620.1402, Fla. Stat. (2013). Here, there is no evidence suggesting that the sale of the Property, the limited partnership’s sole asset, was an act in the ordinary course of the limited partnership’s activities. For that reason, we distinguish RNR Investments Ltd. Partnership v. Peoples First Community Bank, 812 So.2d 561 (Fla. 1st DCA 2002), which held that third parties have no duty to inspect the partnership agreement or inquire otherwise to ascertain the extent of a partner’s actual authority in a transaction occurring in the ordinary course of business. Id. at 566. The limited partnership here was created for the purpose of developing, constructing, and leasing an apartment complex. While Royal American believed that the Property would eventually *1279 be sold, the limited partnership was not established for that purpose.
Section 620.1402, Florida Statutes (2013), requires that, in order for a general partner to bind a limited partnership by an act outside the ordinary course of business, the general partner must obtain the approval of the other partners in accordance with section 620.1406, Florida Statutes. That section provides that “(i) Selling ... or otherwise disposing of all, or substantially all, of the limited partnership’s property, with or without good will, other than in the usual and regular course of the limited partnership’s activities” is an action requiring the approval of all general partners, as well as the limited partners owning a majority of the rights to receive distributions as limited partners at the time the consent is to be effective. § 620.1406(l)(i), (5), Fla. Stat. (2013). Because the sale of the Property does not appear to be a transaction in the ordinary course of business, the General Partner was required by law to obtain the consent of the Limited Partners owning a majority of the rights to receive distributions. That was not done here, at least not explicitly. There is no record evidence indicating that Royal American complied with sections 620.1402 and 620.1406, Florida Statutes, in obtaining the necessary consents before executing the Agreement.
Apparent Authority
“An agency relationship based on apparent authority exists only if the party, asserting the existence of the relationship proves all three of the following elements: (a) a representation by the purported principal; (b) reliance on that representation by a third party; and (c) a change in position by the third party in reliance on the representation.” Fla. State Oriental Med. Ass’n v. Slepin, 971 So.2d 141, 145 (Fla. 1st DCA 2007) (citing Mobil Oil Corp. v. Bransford, 648 So.2d 119 (Fla. 1995)). Reliance of a third party on the apparent authority of a principal’s agent “must be reasonable and rest in the actions of or appearances created by the principal, see Rushing v. Garrett, 375 So.2d 903, 906 (Fla. 1st DCA 1979), and ‘not by agents who often ingeniously create an appearance of authority by their own acts.’” Lensa Corp. v. Poinciana Gardens Ass’n, 765 So.2d 296, 298 (Fla. 4th DCA 2000) (quoting Taco Bell of Cal. v. Zappone, 324 So.2d 121, 124 (Fla. 2d DCA 1975)).
Blue Rock argues that Royal American had the apparent authority to bind the limited partnership. It did not know that the Limited Partners had not consented to the sale of the Property, and the Agreement represented that the Limited Partners had given the necessary consent to sell the Property. Mr. Chapman, president of Royal American, Sterling’s only general partner, made the representations in the Agreement and executed the Agreement on Sterling’s behalf. However, the apparent authority of an agent to act on behalf of a partnership cannot be established by the agent’s acts. See Ford v. Unity Hosp., 32 N.Y.2d 464, 346 N.Y.S.2d 238, 299 N.E.2d 659, 664 (1973). The apparent power of an agent is determined or manifested by the acts or conduct of the principal, not the agent. Id. It is crucial to prove that the principal is responsible for the appearance of authority in the agent. In other words, manifestations of authority by a purported agent do not establish apparent authority to act. Where there are no manifestations of authority by the principal to a third party, apparent authority is not in issue. At a minimum, Blue Rock knew, or should have known, that under section 620.1406(1)® and (5), a majority in interest of the Limited Partners was required to consent to a sale of the Property. *1280 Hence, whether Blue Rock, armed with this knowledge, justifiably relied on the General Partner’s representations is a question of fact.
Under Florida law, apparent authority arises when the principal creates the appearance of an agency relationship. An agency relationship will arise when the principal allows or causes others to believe that an individual has the authority to conduct the act in question, inducing their detrimental reliance. Thus, it is the authority that a principal knowingly tolerates or permits, or that the principal, by his or her actions or words, holds the agent out as possessing. 2 Fla. Jur. 2d Agency & Employment § 65 (2015). Whether Sterling or the Limited Partners knowingly tolerated or permitted the General Partner to act on their behalf remains a disputed question of fact.
Ready, Willing and Able to Close
Sterling contends that the trial court erred in granting partial summary judgment because whether Blue Rock was, or would have been, ready, willing, and able to pay the balance due on the closing date was a disputed issue of material fact. To obtain specific performance, Blue Rock must show that it was, or would have been, as of the closing date, ready, willing, and able to pay the balance due. Lusignan v. Lusignan, 972 So.2d 1076, 1077 (Fla. 5th DCA 2008).
[A] purchaser is financially ready and able to buy: (1) If he has the needed cash in hand, or (2) if he is personally possessed of assets-which in part may consist of the property to be purchased- and a credit rating which enable him with reasonable certainty to command the requisite funds at the required time, [citations omitted] or (3) if he has definitely arranged to raise the necessary money — or as much thereof as he is unable to supply personally — by obtaining a binding commitment for a loan to him for that purpose by a financially able third party, irrespective of whether such loan be secured in part by the property to be purchased.... [W]here the purchaser relies primarily, not upon his own personal assets, but upon the proceeds of a contemplated loan or loans to be made to him by a third party, he is financially able to buy only if he has a definite and binding commitment from such third-party loaner.... A purchaser who personally has little, if any, cash or other assets must establish that the financial crutches to be loaned him by others are both legally and financially dependable.
Hollywood Mall, Inc. v. Capozzi, 545 So.2d 918, 920-21 (Fla. 4th DCA 1989) (quoting Shell Oil Co. v. Kapler, 235 Minn. 292, 50 N.W.2d 707, 712-13 (1951)).
Under the Agreement, Blue Rock needed $31,000,000 to close. According to Blue Rock, $20,500,000 was to be loaned by BankUnited. The remainder would be provided in the form of private equity, with ninety percent coming from Stone-cutter Capital Management, LLC and ten percent coming from Blue Rock, with the assistance of Konover South Apartment Holdings, LLC. The evidence here is far from clear as to Blue Rock’s ability to meet its burden of showing its ability to close. Blue Rock did not have the needed cash in hand, but instead, was relying primarily on loans or capital from third parties to gather the funds required to consummate the sale. Thus, in order to establish that it was ready, willing, and able to purchase, Blue Rock needed to show that it obtained binding commitments from financially able third parties to raise the necessary funds.
Blue Rock failed to conclusively show that it had a binding commitment from BankUnited. Blue Rock claimed that it *1281 arranged for a loan in the amount of $20,500,000 from BankUnited. The record contains a term sheet from BankUnited, giving a basic outline of its terms and conditions. However, the term sheet also states that it is “not a commitment to lend,” but instead, is an expression of Ban-kUnited’s interest in providing Blue Rock’s financing. While Blue Rock claimed that BankUnited verbally commits to close, a BankUnited representative testified otherwise.
Blue Rock also failed to conclusively show that it had a binding commitment with Stonecutter for ninety percent of the remaining equity. Although Blue Rock and Stonecutter entered into a joint venture agreement, it only evidenced Stone-cutter’s binding commitment to supply ninety percent of the deposits, not ninety percent of the remaining equity. A term sheet and unexecuted operating agreement between Blue Rock and Stonecutter provided that Stonecutter would deliver ninety percent of the equity for the purchase of the Property. However,, the operating agreement was never executed and the term sheet was for discussion purposes only. Therefore, neither document created a legally binding obligation. As Stonecutter’s principal recognized, “[t]he only legal obligation for Stonecutter to provide equity to the transaction would be in the forfeiture of its share of the deposit should it not.” Stonecutter’s principal further claimed that he personally had sufficient liquid assets to close the equity without a single investor, and, based on his course of dealings with Blue Rock and to safeguard Stonecutter’s reputation as a market closer, he would have raised the required equity from Stonecutter’s investors. Nevertheless, even if Stonecutter had the necessary funds to meet its ninety percent equity, there is no evidence of a binding commitment between Blue Rock and Stonecutter for The required funds.
The joint venture agreement was the only binding commitment, and it was only a commitment for Stonecutter to supply funding for the deposits.
Finally, Blue Rock failed to conclusively show that it could pay, with Konover’s assistance, the remaining ten percent. Blue Rock claimed that, based on its successful history of closing deals, Konover would have been able to provide its share. Since Konover had supplied the necessary funds before, Blue Rock believed that it would have done so on this occasion. But, there is no record evidence of a binding commitment to supply funds between Kon-over and Blue Rock. Blue Rock’s ability to close was certainly a disputed fact.
Because material issues of fact remain, summary judgment was premature. We reverse and remand for further proceedings.
AFFIRMED in part; REVERSED in part; and REMANDED.
PALMER and EVANDER, JJ., concur.

. We have jurisdiction pursuant to Florida Rule of Appellate Procedure 9.130(a)(3)(B),(C)(ii). We affirm as to the remaining issues raised without comment.

. The "Second Amended and Restated Limited Partnership Agreement and Certificate of Limited Partnership” provides, in pertinent part:
If, at any time, the General Partner deems it to be in the best interest of the Partnership to sell, assign, transfer, pledge, mortgage or hypothecate the Project or any Interests in the Partnership, or to refinance the indebtedness of the Partnership which is secured by the mortgage encumbering the Project, the General Partner shall use its best efforts to effect such transaction on the best terms available. Notwithstanding the foregoing, before the General Partner may effect any such sale, assignment, transfer, pledge, mortgage, hypothecation or refinancing, it must first obtain the Consent of all of the Limited Partners to such sale, assignment, transfer, pledge, mortgage, hy-pothecation or refinancing.

. According to Mr. Chapman, he believed he had consent to sell the Property based on the parties' “normal dealings,” which were conducted in a "somewhat informal manner” for thirty years; Dr. Reich's January 28, 2013, email that the sale of the Property would be a "great thing”; and following their February 21, 2013, telephone conversation.

. In one email, Dr. Reich stated that she just want[ed] to be clear, again, that as Trustee of the Steven M. Reich 1976 Trusts FBO Lisa Reich and Hilary Reich and the ASR 77 Securities Trust # 1, and as President of Vita Via, Inc[.], and ASR-77 Securities, Inc., the General Partner of Lishil, I have not consented to the sale of Sterling Crest and none of these entities that have LP interests in Sterling Crest have consented to the sale.
It is my understanding that you made a unilateral decision to put this property up for sale without obtaining consent of the Limited Partners, as is required by the Partnership Agreement (particularly noted in Section 7.4), and also without giving me, the representative for these entities, the opportunity to review the tax information relevant to the sale. In addition, I did not have any of the relevant financial information and pertinent documents that a Limited Partner would need in order to make a decision as to whether to agree to a sale.