# Third District Court of Appeal

## State of Florida

Opinion filed April 24, 2019.
Not final until disposition of timely filed motion for rehearing.

————————————

Nos. 3D17-132 & 3D17-130
Lower Tribunal No. 12-1350

————————————

**All Seasons Condominium Association, Inc., Pedro Dedesma a/k/a Peter Dedesma, Manuel De La Morena, Emilio Gomez, and John Sanchez, et al.,**
Appellants,

vs.

**Patrician Hotel, LLC, and All Seasons Suites, LLC,**
Appellees.

Appeals from the Circuit Court for Miami-Dade County, Rosa I. Rodriguez, Judge.

Fowler White Burnett, P.A., and Alice K. Sum; Dorta & Ortega, P.A., and Omar Ortega and Rosdaisy Rodriguez, for appellants.

Smoler & Associates, P.A., and Bruce J. Smoler (Hollywood); Phillips, Cantor & Shalek, P.A., and Jeffrey B. Shalek, and Gary S. Phillips (Hollywood), for appellees.

Before LOGUE, LINDSEY and HENDON, JJ.[1]

LINDSEY, J.

———————————————

[1] Judge Hendon did not participate in oral argument.

In these consolidated cases, All Seasons Condominium Association, Inc. (the "Association"), Pedro Dedesma a/k/a Peter Dedesma, Manuel De La Morena, Emilio Gomez, John Sanchez, and Vero Financial Services, et al. (the "Unit Owners")[2] appeal the trial court's final judgment as to liability in favor of plaintiff, Patrician Hotel, LLC and intervening plaintiff, All Seasons Suites, LLC (the "Final Judgment") rendered on December 15, 2016. For the reasons set forth below, we reverse and remand for further proceedings.

## I. BACKGROUND

On October 15, 2010, the Association, acting through its Board of Directors (the "BOD"), unanimously voted to sell the All Seasons Condominium (the "Condominium")—located at 3621 Collins Avenue, Miami Beach and consisting of 106 separate condominium units—to Simon Nemni ("Nemni") for approximately $7.3 million.[3] The BOD and Nemni entered into a Real Estate Purchase and Sale Agreement (the "Master Purchase Agreement") with an effective date of October 19, 2010 (the "Effective Date").

The Master Purchase Agreement required the Association, within 120 days of the Effective Date, to use its best efforts to obtain consent from 100 percent of the Unit Owners to sell their respective units (the "Sale Approval"). Specifically, Paragraph 6 of the Master Purchase Agreement provides:

---

[2] While this action was pending, appellants, Eugenio Carrasco and Irma Carrasco, owners of Unit 305, voluntarily dismissed their appeal.

[3] On August 5, 2011, Nemni assigned his interest in the Master Purchase Agreement to Patrician Hotel, LLC ("Patrician").

Seller shall use its best efforts to obtain written acceptance by each unit owner to the sale of the units in accordance with the terms of this Agreement. If Seller obtains fewer than 100 percent of acceptance of the unit owners, but approval by a sufficient number of unit owners to satisfy the requirements of § 718.117, Florida Statutes, then Seller, at its sole and absolute election, may seek approval by a court of competent jurisdiction of a plan of termination that incorporates the terms of this Agreement. **Seller shall have one hundred twenty (120) days from the Effective Date of this Agreement to either obtain the consent of all unit owners to a closing under this Agreement, or a court order approval (collectively, "Sale Approval").** In the event Seller is unable to obtain 100% approval of the unit owners and elects not to seek court approval of a plan of termination, or seeks but is unable to obtain a court order approving the plan of termination within the applicable time period, then Buyer shall be entitled to the immediate return of its deposit and this Agreement shall be deemed terminated and Seller shall have no liability whatsoever to Buyer.

(Emphasis added). Under Paragraph 6, therefore, the 120-day deadline for Sale Approval was February 16, 2011. Moreover, the Master Purchase Agreement tethers the transaction's "closing date" to the Sale Approval deadline, stating that the sale closing shall be within sixty days of the Sale Approval.

To consummate the sale, the Association was required to obtain written acceptance of every Unit Owner before February 16, 2011, which was to be accomplished through the execution of a Supplemental Contract for Purchase and Sale of All Seasons Condominium Unit (the "Supplemental Contract") by each individual Unit Owner and the Association. Each Supplemental Contract incorporated the Master Purchase

3

Agreement by reference, therefore, every Unit Owner who executed a Supplemental Contract joined the Master Purchase Agreement and agreed to sell their respective unit to Patrician. In other words, the Association was obligated to obtain a Supplemental Contract from every Unit Owner before February 16, 2011, in order for the Condominium sale to move forward. Each Supplemental Contract purportedly gave the BOD authority to take certain actions reasonably necessary to complete the transaction. For example, Paragraph 9(f) of the Supplemental Contract provides:

> Seller proxies his vote, and this document shall serve as such proxy, to the Board to vote in favor of any and all resolutions deemed necessary by the Board under the existing Declaration or By-Laws of the Association to consummate the Master Purchase Agreement, the sale of the Real Property, the plan of termination, or to commence and prosecute any legal action necessary to accomplish these matters.

The Master Purchase Agreement and Supplemental Contracts both contain explicit "time is of the essence" provisions.[4] Similarly, the Master Purchase Agreement and Supplemental Contracts both include identical provisions requiring any modification or amendment, to either agreement, be in writing and signed by

_____

[4] Paragraph 16 of each Supplemental Contract provides that "[t]ime is of the essence of all the terms, provisions and covenants of this Agreement," while Paragraph 25 of the Master Purchase Agreement states in relevant part:

> Time is of the essence of all the terms, provisions and covenants of this Agreement. Time is important to both Seller and Buyer in the performance of this Agreement, and they have agreed that strict compliance is required as to any date or time periods set forth or described herein.

4

all respective parties thereto. Paragraph 12 of the Supplemental Contract—which is identical to Paragraph 20 of the Master Purchase Agreement—provides:

> No amendment, change or modification of this Agreement shall be valid, unless in writing and signed by all of the parties hereto. Each Party has participated fully in the negotiation and preparation of this Agreement with full benefit of counsel. Accordingly, this Agreement shall not be more strictly construed against any Party.

On December 19, 2010, counsel for Nemni sent an email to the Association's attorney, requesting a sixty-day extension of the inspection period and a modification to Paragraph 6 of the Master Purchase Agreement regarding the defined closing date. The email states in relevant part:

> My client is spending significant time and money on this project. He remains motivated and desires to undertake all activities necessary to close this transaction successfully. However, he will need a sixty (60) day extension to the Inspection Period in order to position this transaction for closing. In addition, since the closing date is currently linked to the date on which your client obtains Sale Approval, I would suggest modifying Paragraph six (6) of the contract to state that the closing date will be sixty (60) days following the conclusion of the Inspection Period or sixty (60) days following the date on which the Seller obtains Sale Approval, whichever is later. Please submit this request to your clients and advise me of their response as soon as possible, as my client's work is very much in process and advancing. In the interim, this email is intended to protect my client's deposit from becoming non-refundable and shall function as a termination of the contract in the (hopefully unlikely) event that your clients do not agree to the extension of the Inspection Period requested herein.

Peter Dedesma, who was

5

President of the BOD and a Unit Owner, emailed the Association's attorney on December 28, 2010, stating, "I indicated to Mr. Nemni that the Board after informal discussion decided [to] grant the 60 [day] extension and accept the amendment to closing date but we need to wait until next week to hold a board meeting to make it official." Dedesma, Nemni, and the BOD ostensibly treated these emails as an amendment to the Master Purchase Agreement and Supplemental Contracts that extended the Sale Approval deadline by sixty days, from February 16, 2011, to April 16, 2011. Dedesma testified at trial that only 67 of the 106 Unit Owners had signed Supplemental Contracts as of February 16, 2011.

On April 13, 2011, approximately fifty-six days after the original Sale Approval deadline of February 16, 2011, had expired, the BOD held a meeting and voted unanimously to approve the First Addendum to the Master Purchase Agreement (the "First Addendum"). The First Addendum extended the Sale Approval deadline for five periods of sixty days each (the "Extension Periods"), for a total possible extension of 300 days. Additionally, although the First Addendum permitted Nemni, as the Buyer, to terminate the agreement at the end of each Extension Period, it is silent as to the Seller's ability to terminate.

On November 22, 2011, All Seasons Suites, LLC ("Suites") entered into an agreement to acquire all of the membership interest in Patrician after Patrician closed under the Master Purchase Agreement, which would make Suites the owner

of the Condominium upon completion of the Condominium sale. Pursuant to the terms of the agreement with Suites, Nemni was to realize a profit of over $3 million. On December 11, 2011, the BOD, through its counsel, sent a letter to Nemni's attorney (the "Termination Letter"), advising that the Association would not exercise the final Extension Period under the First Addendum and that it was terminating the Master Purchase Agreement because "the Association is unable to obtain 100% acceptance by the unit owners to the sale." The Termination Letter further provided that the Association would authorize the immediate release of Nemni's deposit being held in escrow.

Patrician filed an action for specific performance on January 9, 2012. A notice of lis pendens was recorded on January 25, 2012, and a non-jury trial was ultimately held on April 12-14 and 19-21, 2016. The trial court entered its Findings of Fact and Conclusions of Law on July 25, 2016, concluding that Paragraph 9(a), 9(b), 9(e), and 9(f) of the Supplemental Contracts demonstrate that the Unit Owners gave explicit authority to the BOD to act on their behalf. More specifically, although the trial court found that the proxy language in Paragraph 9(f) was not a statutory proxy governed by section 718.112, Florida Statutes (2010), or a General Real Estate Power of Attorney, the trial court did conclude that Paragraph 9(f) was a general proxy by which the Unit Owners gave the BOD authority to take all action reasonably necessary to effectuate a closing under the Master Purchase Agreement.

7

On December 15, 2016, the trial court entered final judgment for specific performance and damages in favor of Patrician and against the Association as well as certain Unit Owners. Final judgment was also entered for specific performance in favor of Suites and against Presidential Management Group, Inc. Defined Benefit Plan ("Presidential Management").[5] Additionally, final judgment was entered as to liability only for tortious interference with an advantageous business relationship in favor of Suites and against Dedesma and the Association. However, the trial court reserved jurisdiction to: (i) enter subsequent order(s) in favor of Patrician and against applicable defendants to determine the amount of damages to be awarded to Patrician, and (ii) conduct a trial on the issue of damages regarding the finding of liability in favor of Suites and against Dedesma and the Association.[6] This timely appeal followed.

## II.   JURISDICTION

The trial court's Final Judgment is a non-final order because it reserved jurisdiction to determine the amount of damages to be awarded to Patrician and to also conduct a trial on the issue of damages regarding the finding of liability in

---

[5] Presidential Management was the sole member of Patrician Hotel, LLC. Nemni, as the authorized agent for Presidential Management, executed the November 22, 2011 agreement with All Seasons Suites, LLC, whereby Suites was to acquire Presidential Management's 100 percent member interest in Patrician.

[6] We decline to address the portion of the final judgment on the tortious interference claim as well as the trial court's reservation of jurisdiction to enter subsequent orders to determine damages, and to conduct an additional trial on damages – without making a finding as to whether those portions of the order on appeal are final and, consequently, whether we have jurisdiction – because those issue are moot based on our decision herein.

8

favor of Suites. See 1st Priority Restoration, Inc. v. Salame, 129 So. 3d 1171 (Fla. 3d DCA 2014) (holding that a portion of the trial court's order was not final or appealable because the underlying net damages amount had not yet been adjudicated and reduced to a final judgment). However, orders that determine "the right to immediate possession of property" are non-final orders appealable under Florida Rule of Appellate Procedure 9.130(a)(3)(C)(ii). Fla. R. App. P. 9.130(a)(3)(C)(ii). We therefore treat the appeal in this case as one taken from a non-final order that determines the right to immediate possession of property because the trial court's grant of specific performance concerned the immediate right to real property under the Master Purchase Agreement and Supplemental Contracts. See Malek v. Bright, 7 So. 3d 598, 598 (Fla. 3d DCA 2009) ("Upon further review of the jurisdictional questions promulgated by this Court to the parties sua sponte in this case, we treat the appeal in this case as one taken from nonfinal orders which determine the right to immediate possession of property under Florida Rule of Appellate Procedure 9.130(a)(3)(C)(ii).").

## III. STANDARD OF REVIEW

A trial court's decision to grant specific performance is reviewed under an abuse of discretion standard. See Muniz v. Crystal Lake Project, LLC, 947 So. 2d 464, 469 (Fla. 3d DCA 2006) ("The decision whether to grant or withhold a judgment for specific performance is a matter within the sound discretion of the trial court which will not be disturbed on appeal unless clearly erroneous.").

However, the interpretation of a contract involves a pure question of law that is subject to a *de novo* standard of review. Hammond v. DSY Developers, LLC, 951 So. 2d 985, 988 (Fla. 3d DCA 2007) (citing Florida Power Corp. v. City of Casselberry, 793 So. 2d 1174, 1178 (Fla. 5th DCA 2001)).

## IV.  ANALYSIS

Specific performance is an equitable remedy that can "only be granted when 1) the plaintiff is clearly entitled to it, 2) there is no adequate remedy at law, and 3) the judge believes that justice requires it." Castigliano v. O'Connor, 911 So. 2d 145, 148 (Fla. 3d DCA 2005) (citing Mrahunec v. Fausti, 385 Pa. 64, 68, 121 A.2d 878, 880 (1956)). "In order for a contract to be subject to specific performance, it must appear from the writing constituting the contract that the obligations of the parties with respect to [the] conditions of the contract and actions to be taken by the parties are clear, definite and certain." de Vaux v. Westwood Baptist Church, 953 So. 2d 677, 682 (Fla. 1st DCA 2007) (quoting Brown v. Dobry, 311 So. 2d 159, 160 (Fla. 2d DCA 1975)); see also 330 Michigan Ave., Inc. v. Cambridge Hotel, Inc., 183 So. 2d 725, 726–27 (Fla. 3d DCA 1966) ("Specific performance will not be enforced where the contract is not definite and certain as to essential terms and provisions and is incapable of being made so by the aid of legal presumption or evidence of established customs.").

Therefore, in order to obtain specific performance of an enforceable contract for the purchase and sale of real property, the statute of frauds[7] requires the

10

contract be in writing and signed by the party against whom enforcement is sought. See India Am. Trading Co., Inc. v. White, 896 So. 2d 859, 860 (Fla. 3d DCA 2005) ("Pursuant to the statute [of frauds], no action can be brought to enforce a contract for the sale of land unless the contract is in writing and signed by the party to be charged." (quoting Cavallaro v. Stratford Homes, Inc., 784 So. 2d 619, 621 (Fla. 5th DCA 2001). Thus, this Court has held that the statute of frauds requires satisfaction of the following two conditions in order to obtain specific performance of a contract for the sale of real property: (i) "the contract must be a writing signed by the party against whom enforcement is sought," and (ii) "the writing must contain all of the essential terms of the sale and these terms may not be explained by resort to parol evidence." Fox v. Sails at Laguna Club Dev. Corp., 403 So. 2d 456, 458 (Fla. 3d DCA 1981) (citing Rundel v. Gordon, 111 So. 386 (Fla. 1927)). As a general rule, "[t]here is no definitive list of essential terms that must be present and certain to satisfy the statute of frauds. Rather, the essential terms will vary widely according to the nature and complexity of each transaction and will be evaluated on a case by case basis . . . ." Socarras v. Claughton Hotels, Inc., 374

---

[7] Florida's statute of frauds is outlined in section 725.01, Florida Statutes (2010), and provides in pertinent part:

> No action shall be brought whereby . . . to charge any person . . . upon any contract for the sale of lands . . . unless the agreement or promise upon which such action shall be brought, or some note or memorandum thereof shall be in writing and signed by the party to be charged therewith or by some other person by her or him thereunto lawfully authorized.

So. 2d 1057, 1060 (Fla. 3d DCA 1979).

In the instant case, the dispositive question before us is whether the Unit Owners gave authority to the BOD and Dedesma, through the Supplemental Contracts, to take *all* action reasonably necessary to effectuate a closing under the Master Purchase Agreement, including the extension of the Sale Approval deadline and execution of the First Addendum.  Absent such grant of authority by the Unit Owners, the Master Purchase Agreement and Supplemental Contracts automatically terminated on February 16, 2011, when the Sale Approval prerequisite of 100 percent Unit Owner consent was not satisfied.

### A. The Proxy Provision

Patrician and Suites contend that the proxy language under Paragraph 9(f), whether read in isolation or together with other provisions in the Supplemental Contracts, operates as a general proxy that provided the BOD with actual authority to bind the Unit Owners to the Master Purchase Agreement and First Addendum. However, pursuant to section 718.112, Florida Statutes (2010), "unit owners in a residential condominium may not vote by general proxy, but may vote by limited proxies substantially conforming to a limited proxy form adopted by the [Division of Florida Condominiums, Timeshares, and Mobile Homes]."  § 718.112(2)(b)2, Fla. Stat. (2010).

Accordingly, the Division of Florida Condominiums, Timeshares, and Mobile Homes (the "Division") promulgated Florida Administrative Code Rule

12

61B-23.002(5), which states that unit owners, while not permitted to vote by general proxy, "may vote by limited proxy substantially similar to the SAMPLE LIMITED PROXY FORM adopted by the division as DBPR Form CO 6000-7." Fla. Admin. Code R. 61B-23.002(5) (2010). In no way does the one-sentence proxy language of Paragraph 9(f), nor any other provision of the Supplemental Contract or Master Purchase Agreement, bear any resemblance or similarity to the sample proxy form adopted by the Division as DBPR Form CO 6000-7. Moreover, to the extent Patrician and Suites contend that Paragraph 9(f) should be treated as a general proxy not governed by chapter 718 of the Florida Statutes, we disagree because such a position overlooks the simple fact that this entire dispute concerns the failed purchase and sale of a condominium building. Furthermore, both the Supplemental Contracts and Master Purchase Agreement state that certain obligations contained therein must comply with the statutory requirements or procedures under chapter 718. As such, the proxy provision of the Supplemental Contracts is not a valid proxy, general or limited, under Florida condominium law.

## B. Actual Authority

Patrician and Suites also assert that, pursuant to the Supplemental Contracts, the Unit Owners provided actual and apparent authority to Dedesma and the BOD to act on their behalf for all purposes related to closing under the Master Purchase Agreement. To establish the existence of an actual agency relationship, the following essential elements must be established: "(1) acknowledgment by the

13

principal that the agent will act for him, (2) the agent's acceptance of the undertaking, and (3) control by the principal over the actions of the agent." Fernandez v. Florida Nat'l Coll., Inc., 925 So. 2d 1096, 1101 (Fla. 3d DCA 2006) (quoting Goldschmidt v. Holman, 571 So. 2d 422, 424 n.5 (Fla. 1990)).

In the instant case, there can be no doubt that a Unit Owner who properly executed a Supplemental Contract before February 16, 2011, gave certain limited authority to the BOD to vote on their behalf for resolutions, under the Declaration or By-Laws, which the BOD deemed necessary to consummate the transaction. Paragraph 9(f), however, does not evince an actual agency relationship whereby a Unit Owner, in signing a Supplemental Contract, manifested their intent to grant the BOD and Dedesma actual authority to take *any* action on their behalf in order to effectuate a closing. For example, Patrician and Suites contend that the December 2010 email exchange between Nemni's counsel, the Association's counsel, and Dedesma extended the Supplemental Contract deadlines because Dedesma had the actual authority to take any action, on behalf of the Unit Owners, to accomplish the Condominium's sale. However, the express language of Paragraph 9(f) makes no reference to Dedesma or the Supplemental Contracts, while the record is silent as to any acknowledgment by the Unit Owners that Dedesma or the BOD were granted such broad authority over their individual property rights.

"It is axiomatic that the clear and unambiguous words of a contract are the

best evidence of the intent of the parties." <u>Murry v. Zynyx Mktg. Commc'ns, Inc.</u>, 774 So. 2d 714, 715 (Fla. 3d DCA 2000) (citing <u>Turk v. Hysan Prods. Co.</u>, 149 So. 2d 584, 585 (Fla. 3d DCA 1963)).  Clear and unambiguous contracts, therefore, "should be construed as written, and the court can give them no other meaning." <u>Gulliver Schs., Inc. v. Snay</u>, 137 So. 3d 1045, 1047 (Fla. 3d DCA 2014) (quoting <u>Khosrow Maleki, P.A. v. M.A. Hajianpour, M.D., P.A.</u>, 771 So. 2d 628, 631 (Fla. 4th DCA 2000)).  In construing a contract, the legal effect of its provisions "must be determined from the words of the entire contract and a court may not violate clear meaning to create ambiguity." <u>AAA Life Ins. Co. v. Nicolas</u>, 603 So. 2d 622, 623 (Fla. 3d DCA 1992) (citing <u>Hoffman v. Robinson</u>, 213 So. 2d 267, 268 (Fla. 3d DCA 1968)).  "Stated another way, an isolated sentence of [a contract] should not be construed alone, but it should be construed in connection with other provisions . . . to arrive at a reasonable construction to accomplish the intent and purpose of the parties." <u>Hand v. Grow Constr., Inc.</u>, 983 So. 2d 684, 687 (Fla. 1st DCA 2008) (alteration in original) (internal quotations omitted).

Here, Paragraph 12 of the Supplemental Contracts and Paragraph 20 of the Master Purchase Agreement both state in unambiguous and identical language that "[n]o amendment, change or modification . . . shall be valid, unless in writing and signed by all of the parties hereto."  Accordingly, if Paragraph 9(f) gave the BOD and Dedesma actual authority to modify the Sale Approval deadline and other essential terms of the executed Supplemental Contracts, as Patrician and Suites

15

argue properly occurred through the December 2010 email exchange and First Addendum, Paragraph 12 of the Supplemental Contracts and Paragraph 20 of the Master Purchase Agreement would be rendered useless and inexplicable. Perez-Gurri Corp. v. McLeod, 238 So. 3d 347, 350 (Fla. 3d DCA 2017) ("[W]e are constrained by law to construe a contract as a whole so as to give effect, as here, to all provisions of the agreement if it can be reasonably done." (quoting McArthur v. A.A. Green & Co. of Fla., 637 So.2d 311, 312 (Fla. 3d DCA 1994))); see also Silver Shells Corp. v. St. Maarten at Silver Shells Condo. Ass'n, Inc., 169 So. 3d 197, 203 (Fla. 1st DCA 2015) ("[A] cardinal principle of contract interpretation is that the contract must be interpreted in a manner that does not render any provision of the contract meaningless."). Thus, reading the Supplemental Contract "as a whole," Paragraph 9(f) does not confer actual authority upon the BOD or Dedesma to act on behalf of the Unit Owners and modify the essential terms of their distinct Supplemental Contracts.

Similarly, the proxy language of Paragraph 9(f) does not qualify as a general power of attorney under Florida law.[8] The trial court found that the December 2010 emails between Nemni's counsel, the Association's attorney, and Dedesma operated as an extension of the Sale Approval deadline from February 16, 2011, to

---

[8] The Florida Power of Attorney Act, §§ 709.2101-.2402, Florida Statutes (2011), did not go into effect until October 1, 2011. See § 709.2106(2) ("A power of attorney executed before October 1, 2011, is valid if its execution complied with the law of this state at the time of execution."). Thus, Paragraph 9(f) must be considered under § 709.01-.11, Florida Statutes (2010).

April 16, 2011, because Dedesma had the authority to extend the Supplemental Contracts for all Unit Owners who signed one. However, even under the most generous reading of Paragraph 9(f), the purported proxy language does not confer the authority upon the BOD, much less Dedesma, to unilaterally extend the Sale Approval deadline and the defined closing date outlined in the Supplemental Contracts. "The established rule is that a power of attorney must be strictly construed and the instrument will be held to grant only those powers which are specified." Bloom v. Weiser, 348 So. 2d 651, 653 (Fla. 3d DCA 1977); see also Dingle v. Prikhdina, 59 So. 3d 326, 328 (Fla. 5th DCA 2011) ("Generally, the rule is that a power of attorney must be strictly construed and the instrument will be held to grant only those powers which are specified." (citing Bloom, 348 So. 2d at 653)).

Paragraph 9(f) of the Supplemental Contract states that the Unit Owner "proxies his vote . . . to the Board to vote in favor of any and all resolutions deemed necessary by the Board under the existing Declaration or By-Laws of the Association to consummate the Master Purchase Agreement, the sale of the Real Property, the plan of termination," or to take legal action necessary to accomplish such matters. Because neither Paragraph 9(f), nor any other provision of the Supplemental Contracts, contain a specific grant of power authorizing the BOD or Dedesma to modify essential terms of the Supplemental Contracts, no general power of attorney existed to permit the extension of the Sale Approval deadline or

17

subsequent execution of the First Addendum on behalf of the Unit Owners.

### C. Apparent Authority

Next, we address the issue of an agency relationship based on apparent authority. "An agent's authority need not be conferred in express terms, but may be implied or apparent under justifying circumstances." Am. Ladder & Scaffold Co. v. Miami Ventilated Awning Mfg. Co., 161 So. 2d 699, 700 (Fla. 3d DCA 1964) (citing Thomkin Corp. v. Miller, 24 So. 2d 48, 49 (Fla. 1945)). An agency relationship based on apparent authority only exists if the following three elements are present: "1) a representation by the purported principal; 2) reliance on that representation by a third party; and 3) a change in position by the third party in reliance on the representation." Ocana v. Ford Motor Co., 992 So. 2d 319, 326 (Fla. 3d DCA 2008) (citing Mobil Oil Corp. v. Bransford, 648 So. 2d 119, 121 (Fla. 1995)). "Apparent authority does not arise from the subjective understanding of the person dealing with the purported agent, nor from appearances created by the purported agent himself." Izquierdo v. Hialeah Hosp., Inc., 709 So. 2d 187, 188 (Fla. 3d DCA 1998) (quoting Spence, Payne, Masington & Grossman, P.A. v. Philip M. Gerson, P.A., 483 So. 2d 775, 777 (Fla. 3d DCA 1986)). Instead, the words and actions of the principal must be the focus because apparent authority exists only where the principal creates the appearance of an agency relationship. See Guadagno v. Lifemark Hosps. of Fla., Inc., 972 So. 2d 214, 218 (Fla. 3d DCA 2007); see also Jackson Hewitt, Inc. v. Kaman, 100 So. 3d 19, 31 (Fla. 2d DCA

18

2011) ("In considering a claim based on apparent authority, the inquiry properly focuses on the actions of or appearances created by the principal, not by the agent."). However, any reliance by a third party on a purported agent's apparent authority must be reasonable. Regions Bank v. Maroone Chevrolet, L.L.C., 118 So. 3d 251, 255 (Fla. 3d DCA 2013) (citing Izquierdo, 709 So. 2d at 188); see also Sterling Crest, Ltd. v. Blue Rock Partners Realty Group, LLC, 164 So. 3d 1273, 1279 (Fla. 5th DCA 2015) ("Reliance of a third party on the apparent authority of a principal's agent must be reasonable and rest in the actions of or appearances created by the principal, and not by agents who often ingeniously create an appearance of authority by their own acts." (internal quotations and citations omitted)).

Here, there was no reasonable basis to believe that the BOD and Dedesma had the apparent authority to modify essential terms within a Unit Owner's individually executed Supplemental Contract. Such a position is untenable and would lead to illogical results. See King v. Bray, 867 So. 2d 1224, 1227 (Fla. 5th DCA 2004) ("The courts generally agree that where one interpretation of a contract would be absurd and another would be consistent with reason and probability, the contract should be interpreted in the rational manner."). For example, to accept the apparent authority argument proffered by Patrician and Suites would mean the BOD and Dedesma also possessed the authority to reduce the overall Condominium sale price, so long as such action was deemed necessary to

19

consummate the transaction.  This, in turn, would reduce the amount each Unit Owner could ultimately receive for selling their individual property, which would be an unreasonable outcome.

Accordingly, any reliance by a third party on such a tenuous appearance of apparent authority is unreasonable.  Indeed, Dedesma himself did not believe he possessed the apparent authority to bind the Unit Owners, writing in response to Nemni's December 2010 deadline extension request that, "the Board after informal discussion decided [to] grant the 60 [day] extension and accept the amendment to closing date but we need to wait until next week to hold a board meeting to make it official."[9]  The record is silent as to any express or implied representation of authority by the Unit Owners to Nemni or Suites that created the reasonable appearance of an agency relationship with Dedesma or the BOD.  See Roessler v. Novak, 858 So. 2d 1158, 1162 (Fla. 2d DCA 2003) ("[A]pparent authority exists only where the principal creates the appearance of an agency relationship."). Moreover, Patrician and Suites mistakenly rely on the conduct of Dedesma and the BOD as manifestations of apparent authority.  See Sterling Crest, Ltd., 164 So. 3d at 1279 ("[M]anifestations of authority by a purported agent do not establish apparent authority to act. Where there are no manifestations of authority by the

_____

[9] The record is not clear as to the nature of the BOD's "informal discussion" purportedly approving Nemni's extension request.  However, to the extent the BOD used email to cast a vote on the issue, such action is explicitly prohibited under section 718.112.  See § 718.112(2)(c) ("Members of the board of administration may use e-mail as a means of communication but may not cast a vote on an association matter via e-mail.").

20

principal to a third party, apparent authority is not in issue.").

Furthermore, the plain language of the Supplemental Contracts and the Master Purchase Agreement establish that the parties agreed not to allow a waiver or modification of any contractual term without first reducing it to writing. See Bradley v. Sanchez, 943 So. 2d 218, 222 (Fla. 3d DCA 2006) (finding a contract provision that provided "[m]odifications of this Contract will not be binding unless in writing, signed and delivered by the party to be bound" was language that prevented an oral waiver or modification to the written contract). Similarly, Paragraph 12 of the Supplemental Contracts and Paragraph 20 of the Master Purchase Agreement clearly state that "[n]o amendment, change or modification of this Agreement shall be valid, unless in writing and signed by all of the parties hereto." This language prevents an oral modification or waiver of the closing date and Sale Approval deadline. See Henley v. MacDonald, 971 So. 2d 998, 1001 (Fla. 4th DCA 2008) (concluding that the language of a similar provision precluded an oral waiver or modification of the closing date). Accordingly, the time of the essence provisions found in Paragraph 16 and Paragraph 25 of the Supplemental Contract and Master Purchase Agreement, respectively, could not have been waived by Dedesma or the BOD unless in writing and signed by all parties against whom the waiver was asserted. See Rybovich Boat Works, Inc. v. Atkins, 587 So. 2d 519, 522 (Fla. 4th DCA 1991) ("Thus under the anti-waiver provision of this agreement the time of the essence provision could not have been

21

waived unless there was a writing signed by the party against whom the waiver was asserted."). Because the purported extension of the Supplemental Contracts and Master Purchase Agreement was not in writing, nor signed by the Unit Owners, there was no waiver of any deadline and both agreements automatically terminated on February 16, 2011. Thus, the BOD and Dedesma lacked the apparent authority to modify essential terms of executed Supplemental Contracts.

### D. Statute of Frauds

Lastly, the statute of frauds requires a written contract for the sale of real estate and further "prohibits the oral modification of a contract for the sale of land under the doctrine of promissory estoppel." Bradley, 943 So. 2d at 222 (citing Shore Holdings, Inc. v. Seagate Beach Quarters, Inc., 842 So. 2d 1010, 1012 (Fla. 4th DCA 2003)). The Florida Supreme Court has explained that "the Statute of Frauds is a legislative prerogative, grounded in a policy judgment that certain contracts should not be enforced unless supported by written evidence." DK Arena, Inc. v. EB Acquisitions I, LLC, 112 So. 3d 85, 93 (Fla. 2013) (citing Tanenbaum v. Biscayne Osteopathic Hosp., Inc., 190 So. 2d 777, 779 (Fla. 1966)). Accordingly, "[t]he statute should be strictly construed to prevent the fraud it was designed to correct, and so long as it can be made to effectuate this purpose, courts should be reluctant to take cases from its protection." LaRue v. Kalex Constr. & Dev., Inc., 97 So. 3d 251, 253 (Fla. 3d DCA 2012) (quoting Yates v. Ball, 181 So. 341, 344 (Fla. 1937)).

Here, no Unit Owner signed or was made a party to the December 2010 email chain that allegedly extended the Supplemental Contract and Master Purchase Agreement deadlines. No Unit Owner who executed a Supplemental Contract prior to the February 16, 2011 date was asked to re-execute their Supplemental Contract, and Dedesma clearly stated that the requested extension would not be "official" until the BOD met and voted on a resolution, which did not occur until April 13, 2011. Accordingly, the statute of frauds was not satisfied and no enforceable contract was in existence for the First Addendum to modify when approved by the BOD on April 13, 2011, approximately fifty-six days after the original Sale Approval deadline expired.

Additionally, any suggestion that partial performance by the parties was sufficient to remove the December 2010 email extensions and First Addendum from the purview of the statute of frauds is misplaced. "[B]efore it becomes proper or necessary to determine whether the facts permit the enforcement of such a contract, as an exception under the Statute of Frauds, it must first be determined that" an oral contract exists. Gable v. Miller, 104 So. 2d 358, 360 (Fla. 1958). Because the BOD and Dedesma lacked the authority to unilaterally modify essential terms of a Unit Owner's executed Supplemental Contract, there was no contract in existence on April 13, 2011, for the BOD and Nemni to modify. Moreover, the trial court relied primarily on conduct by the BOD, purportedly on behalf of Unit Owners, to conclude that the Unit Owners partially performed and

23

therefore the statute of frauds did not apply. However, such conduct by the BOD is immaterial and does not illustrate partial performance by Unit Owners because neither the BOD nor Dedesma was acting as an agent authorized to unilaterally extend the Supplemental Contracts or Master Purchase Agreement.

## V.    CONCLUSION

Based on the foregoing reasons, we conclude that the Unit Owners did not give authority to the BOD and Dedesma, through the Supplemental Contracts, to take *all* action reasonably necessary to effectuate a closing under the Master Purchase Agreement, including the extension of the Sale Approval deadline and execution of the First Addendum. Accordingly, the Master Purchase Agreement and executed Supplemental Contracts automatically terminated on February 16, 2011, when the Sale Approval condition of 100 percent Unit Owner consent was not satisfied.

Reversed and remanded for further proceedings.